(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SAMANTAR *v.* YOUSUF ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 08–1555.  Argued March 3, 2010—Decided June 1, 2010

Respondents, who were persecuted by the Somali government during the 1980's, filed a damages action alleging that petitioner, who then held high level government positions, exercised command and control over the military forces committing the abuses; that he knew or should have known of these acts; and that he aided and abetted in their commission.  The District Court concluded that it lacked subject-matter jurisdiction and granted petitioner's motion to dismiss the suit, resting its decision on the Foreign Sovereign Immunities Act of 1976 (FSIA or Act), which provides that a "foreign state shall be immune from the jurisdiction" of both federal and state courts except as provided in the Act, 28 U. S. C. §1604.  The Fourth Circuit reversed, holding that the FSIA does not apply to officials of a foreign state.

*Held:* The FSIA does not govern petitioner's claim of immunity.  Pp. 4–20.

  (a) Under the common-law doctrine of foreign sovereign immunity, see *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, if the State Department granted a sovereign's diplomatic request for a "suggestion of immunity," the district court surrendered its jurisdiction, *Ex parte Peru*, 318 U. S. 573, 581, 587.  If the State Department refused, the court could decide the immunity issue itself.  *Id.,* at 587.  In 1952, the State Department moved from a policy of requesting immunity in most actions against friendly sovereigns to a "restrictive" theory that confined immunity "to suits involving the foreign sovereign's public acts."  *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 487.  Inconsistent application of sovereign immunity followed, leading to the FSIA, whose primary purposes are (1) to endorse and codify the restrictive theory, and (2) to transfer primary responsibility for deciding "claims of foreign states to immunity" from the State Department

to the courts. §1602. This Act now governs the determination whether a foreign state is entitled to sovereign immunity. Pp. 4–7.

(b) Reading the FSIA as a whole, there is nothing to suggest that "foreign state" should be read to include an official acting on behalf of that state. The Act specifies that a foreign state "includes a political subdivision . . . or an agency or instrumentality" of that state, §1603(a), and specifically delimits what counts as an "agency or instrumentality," §1603(b). Textual clues in the "agency or instrumentality" definition—"any entity" matching three specified characteristics, *ibid.*—cut against reading it to include a foreign official. "Entity" typically refers to an organization; and the required statutory characteristics—*e.g.*, "separate legal person," §1603(b)(1)—apply awkwardly, if at all, to individuals. Section 1603(a)'s "foreign state" definition is also inapplicable. The list set out there, even if illustrative rather than exclusive, does not suggest that officials are included, since the listed defendants are all entities. The Court's conclusion is also supported by the fact that Congress expressly mentioned officials elsewhere in the FSIA when it wished to count their acts as equivalent to those of the foreign state. Moreover, other FSIA provisions—*e.g.,* §1608(a)—point away from reading "foreign state" to include foreign officials. Pp. 7–13.

(c) The FSIA's history and purposes also do not support petitioner's argument that the Act governs his immunity claim. There is little reason to presume that when Congress codified state immunity, it intended to codify, *sub silentio,* official immunity. The canon of construction that statutes should be interpreted consistently with the common law does not help decide the question whether, when a statute's coverage is ambiguous, Congress intended it to govern a particular field. State and official immunities may not be coextensive, and historically, the Government has suggested common-law immunity for individual officials even when the foreign state did not qualify. Though a foreign state's immunity may, in some circumstances, extend to an individual for official acts, it does not follow that Congress intended to codify that immunity in the FSIA. Official immunity was simply not the problem that Congress was addressing when enacting that Act. The Court's construction of the Act should not be affected by the risk that plaintiffs may use artful pleading to attempt to select between application of the FSIA or the common law. This case, where respondents have sued petitioner in his personal capacity and seek damages from his own pockets, is governed by the common law because it is not a claim against a foreign state as defined by the FSIA. Pp. 13–19.

(d) Whether petitioner may be entitled to common-law immunity and whether he may have other valid defenses are matters to be ad-

Syllabus

dressed in the first instance by the District Court.  P. 20.

552 F. 3d 371, affirmed and remanded.

STEVENS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, ALITO, and SOTOMAYOR, JJ., joined.  ALITO, J., filed a concurring opinion.  THOMAS, J., filed an opinion concurring in part and concurring in the judgment.  SCALIA, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 08–1555

―――――――

## MOHAMED ALI SAMANTAR, PETITIONER *v.* BASHE ABDI YOUSUF ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 1, 2010]

JUSTICE STEVENS delivered the opinion of the Court.

From 1980 to 1986 petitioner Mohamed Ali Samantar was the First Vice President and Minister of Defense of Somalia, and from 1987 to 1990 he served as its Prime Minister. Respondents are natives of Somalia who allege that they, or members of their families, were the victims of torture and extrajudicial killings during those years. They seek damages from petitioner based on his alleged authorization of those acts. The narrow question we must decide is whether the Foreign Sovereign Immunities Act of 1976 (FSIA or Act), 28 U. S. C. §§1330, 1602 *et seq.*, provides petitioner with immunity from suit based on actions taken in his official capacity. We hold that the FSIA does not govern the determination of petitioner's immunity from suit.

I

Respondents are members of the Isaaq clan, which included well-educated and prosperous Somalis who were subjected to systematic persecution during the 1980's by the military regime then governing Somalia. They allege that petitioner exercised command and control over mem-

bers of the Somali military forces who tortured, killed, or arbitrarily detained them or members of their families; that petitioner knew or should have known of the abuses perpetrated by his subordinates; and that he aided and abetted the commission of these abuses.[1] Respondents' complaint sought damages from petitioner pursuant to the Torture Victim Protection Act of 1991, 106 Stat. 73, note following 28 U. S. C. §1350, and the Alien Tort Statute, 28 U. S. C. §1350. Petitioner, who was in charge of Somalia's armed forces before its military regime collapsed, fled Somalia in 1991 and is now a resident of Virginia. The United States has not recognized any entity as the government of Somalia since the fall of the military regime. See Brief for United States as *Amicus Curiae* 4.

Respondents filed their complaint in November 2004, and petitioner promptly moved to dismiss. The District Court stayed the proceedings to give the State Department an opportunity to provide a statement of interest regarding petitioner's claim of sovereign immunity. Each month during the ensuing two years, petitioner advised the court that the State Department had the matter "'still under consideration.'" No. 1:04cv1360 (ED Va., Aug. 1, 2007), App. to Pet. for Cert. 44a. In 2007, having received no response from the State Department, the District Court reinstated the case on its active docket. The court concluded that it did not have subject-matter jurisdiction and granted petitioner's motion to dismiss.

The District Court's decision rested squarely on the

---

[1] Although we do not set out respondents' allegations in detail, the District Court's written opinion contains a comprehensive summary, describing not only the abuses respondents suffered but also the historical context in which the abuses occurred, as well as some of the attempts to establish a stable government in Somalia in recent years. See No. 1:04cv1360 (ED Va., Aug. 1, 2007), App. to Pet. for Cert. 31a–43a.

FSIA.[2] The FSIA provides that a "foreign state shall be immune from the jurisdiction" of both federal and state courts except as provided in the Act, 28 U. S. C. §1604, and the District Court noted that none of the parties had argued that any exception was applicable, App. to Pet. for Cert. 46a–47a. Although characterizing the statute as silent on its applicability to the officials of a foreign state, the District Court followed appellate decisions holding that a foreign state's sovereign immunity under the Act extends to "'an individual acting in his official capacity on behalf of a foreign state,'" but not to "'an official who acts beyond the scope of his authority.'" *Id.*, at 47a (quoting *Velasco* v. *Government of Indonesia*, 370 F. 3d 392, 398, 399 (CA4 2004)). The court rejected respondents' argument that petitioner was necessarily acting beyond the scope of his authority because he allegedly violated international law.[3]

The Court of Appeals reversed, rejecting the District Court's ruling that the FSIA governs petitioner's immunity from suit. It acknowledged "the majority view"

————————

[2] Petitioner argued that, in addition to his immunity under the FSIA, the complaint should be dismissed on a number of other grounds, which the District Court did not reach. See *id.*, at 45a, n. 11.

[3] Because we hold that the FSIA does not govern whether an individual foreign official enjoys immunity from suit, we need not reach respondents' argument that an official is not immune under the FSIA for acts of torture and extrajudicial killing. See Brief for Respondents 51–53. We note that in determining petitioner had not acted beyond the scope of his authority, the District Court afforded great weight to letters from the Somali Transitional Federal Government (TFG) to the State Department, App. to Pet. for Cert. 55a, in which the TFG supported petitioner's claim of immunity and stated "the actions attributed to [petitioner] in the lawsuit . . . would have been taken by [petitioner] in his official capacities," App. 104. Although the District Court described the TFG as "recognized by the United States as the governing body in Somalia," App. to Pet. for Cert. 54a, the United States does not recognize the TFG (or any other entity) as the government of Somalia, see Brief for United States as *Amicus Curiae* 5.

among the Circuits that "the FSIA applies to individual officials of a foreign state."  552 F. 3d 371, 378 (CA4 2009).[4]  It disagreed with that view, however, and concluded, "based on the language and structure of the statute, that the FSIA does not apply to individual foreign government agents like [petitioner]."  *Id.*, at 381.[5]  Having found that the FSIA does not govern whether petitioner enjoys immunity from suit, the Court of Appeals remanded the case for further proceedings, including a determination of whether petitioner is entitled to immunity under the common law.  *Id.*, at 383–384.  We granted certiorari.  557 U. S. ___ (2009).

## II

The doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted in 1976.  In *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983), we explained that in *Schooner Exchange* v. *McFaddon*, 7 Cranch 116 (1812), "Chief Justice Marshall concluded that . . . the United States had impliedly waived jurisdiction over certain activities of

——————

[4] Compare 552 F. 3d, at 381 (holding the FSIA does not govern the immunity of individual foreign officials), and *Enahoro* v. *Abubakar*, 408 F. 3d 877, 881–882 (CA7 2005) (same), with *Chuidian* v. *Philippine Nat. Bank*, 912 F. 2d 1095, 1103 (CA9 1990) (concluding that a suit against an individual official for acts committed in his official capacity must be analyzed under the FSIA), *In re Terrorist Attacks on September 11, 2001*, 538 F. 3d 71, 83 (CA2 2008) (same), *Keller* v. *Central Bank of Nigeria*, 277 F. 3d 811, 815 (CA6 2002) (same), *Byrd* v. *Corporacion Forestal y Industrial de Olancho S. A.*, 182 F. 3d 380, 388 (CA5 1999) (same), and *El-Fadl* v. *Central Bank of Jordan*, 75 F. 3d 668, 671 (CADC 1996) (same).

[5] As an alternative basis for its decision, the Court of Appeals held that even if a current official is covered by the FSIA, a former official is not.  See 552 F. 3d, at 381–383.  Because we agree with the Court of Appeals on its broader ground that individual officials are not covered by the FSIA, petitioner's status as a former official is irrelevant to our analysis.

foreign sovereigns." The Court's specific holding in *Schooner Exchange* was that a federal court lacked jurisdiction over "a national armed vessel . . . of the emperor of France," *id.*, at 146, but the opinion was interpreted as extending virtually absolute immunity to foreign sovereigns as "a matter of grace and comity," *Verlinden*, 461 U. S., at 486.

Following *Schooner Exchange*, a two-step procedure developed for resolving a foreign state's claim of sovereign immunity, typically asserted on behalf of seized vessels. See, *e.g.*, *Republic of Mexico* v. *Hoffman*, 324 U. S. 30, 34–36 (1945); *Ex parte Peru*, 318 U. S. 578, 587–589 (1943); *Compania Espanola de Navegacion Maritima, S. A.* v. *The Navemar*, 303 U. S. 68, 74–75 (1938). Under that procedure, the diplomatic representative of the sovereign could request a "suggestion of immunity" from the State Department. *Ex parte Peru*, 318 U. S., at 581. If the request was granted, the district court surrendered its jurisdiction. *Id.*, at 588; see also *Hoffman*, 324 U. S., at 34. But "in the absence of recognition of the immunity by the Department of State," a district court "had authority to decide for itself whether all the requisites for such immunity existed." *Ex parte Peru*, 318 U. S., at 587; see also *Compania Espanola*, 303 U. S., at 75 (approving judicial inquiry into sovereign immunity when the "Department of State . . . declined to act"); *Heaney* v. *Government of Spain*, 445 F. 2d 501, 503, and n. 2 (CA2 1971) (evaluating sovereign immunity when the State Department had not responded to a request for its views). In making that decision, a district court inquired "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Hoffman*, 324 U. S., at 36. Although cases involving individual foreign officials as defendants were rare, the same two-step procedure was typically followed when a foreign official asserted immunity. See, *e.g.*, *Heaney*, 445 F. 2d, at 504–505; *Waltier* v.

*Thomson*, 189 F. Supp. 319 (SDNY 1960).[6]

Prior to 1952, the State Department followed a general practice of requesting immunity in all actions against friendly sovereigns, but in that year the Department announced its adoption of the "restrictive" theory of sovereign immunity. *Verlinden*, 461 U. S., at 486–487; see also Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 984–985 (1952). Under this theory, "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U. S., at 487. This change threw "immunity determinations into some disarray," because "political considerations sometimes led the Department to file 'suggestions of immunity in cases where immunity would not have been available under the restrictive theory.'" *Republic of Austria* v. *Altmann*, 541 U. S. 677, 690 (2004) (quoting *Verlinden*, 461 U. S., at 487).

Congress responded to the inconsistent application of sovereign immunity by enacting the FSIA in 1976. *Altmann*, 541 U. S., at 690–691; see also *Verlinden,* 461 U. S., at 487–488. Section 1602 describes the Act's two primary purposes: (1) to endorse and codify the restrictive theory of sovereign immunity, and (2) to transfer primary responsibility for deciding "claims of foreign states to immunity" from the State Department to the courts.[7]

_____

[6] Diplomatic and consular officers could also claim the "specialized immunities" accorded those officials, Restatement (Second) of Foreign Relations Law of the United States §66, Comment *b* (1964–1965) (hereinafter Restatement), and officials qualifying as the "head of state" could claim immunity on that basis, see *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 137 (1812) (describing "the exemption of the person of the sovereign" from "a jurisdiction incompatible with his dignity").

[7] The full text of §1602, entitled "Findings and declaration of pur-

Opinion of the Court

After the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity.

What we must now decide is whether the Act also covers the immunity claims of foreign officials. We begin with the statute's text and then consider petitioner's reliance on its history and purpose.

## III

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" except as provided in the Act. §1604. Thus, if a defendant is a "foreign state" within the meaning of the Act, then the defendant is immune from jurisdiction unless one of the exceptions in the Act applies. See §§1605–1607 (enumerating exceptions). The Act, if it applies, is the "sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 439 (1989). The question we face in this case is whether an individual sued for conduct undertaken in his official capacity is a "foreign state" within the meaning of the Act.

The Act defines "foreign state" in §1603 as follows:

"(a) A 'foreign state' . . . includes a political subdivi-

––––––––––

pose," reads as follows:

"The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter."

sion of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

  "(b) An 'agency or instrumentality of a foreign state' means any entity—

  "(1) which is a separate legal person, corporate or otherwise, and

  "(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

  "(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country."

The term "foreign state" on its face indicates a body politic that governs a particular territory. See, *e.g.*, Restatement §4 (defining "state" as "an entity that has a defined territory and population under the control of a government and that engages in foreign relations"). In §1603(a), however, the Act establishes that "foreign state" has a broader meaning, by mandating the inclusion of the state's political subdivisions, agencies, and instrumentalities. Then, in §1603(b), the Act specifically delimits what counts as an agency or instrumentality. Petitioner argues that either "foreign state," §1603(a), or "agency or instrumentality," §1603(b), could be read to include a foreign official. Although we agree that petitioner's interpretation is literally possible, our analysis of the entire statutory text persuades us that petitioner's reading is not the meaning that Congress enacted.

We turn first to the term "agency or instrumentality of a foreign state," §1603(b). It is true that an individual official could be an "agency or instrumentality," if that term is given the meaning of "any thing or person through which action is accomplished," *In re Terrorist Attacks on*

*Sept. 11, 2001*, 538 F. 3d 71, 83 (CA2 2008). But Congress
has specifically defined "agency or instrumentality" in the
FSIA, and all of the textual clues in that definition cut
against such a broad construction.

First, the statute specifies that "'agency or instrumen-
tality . . .' means any *entity*" matching three specified
characteristics, §1603(b) (emphasis added), and "entity"
typically refers to an organization, rather than an individ-
ual. See, *e.g.*, Black's Law Dictionary 612 (9th ed. 2009).
Furthermore, several of the required characteristics apply
awkwardly, if at all, to individuals. The phrase "separate
legal person, corporate or otherwise," §1603(b)(1), could
conceivably refer to a natural person, solely by virtue of
the word "person." But the phrase "separate legal person"
typically refers to the legal fiction that allows an entity to
hold personhood separate from the natural persons who
are its shareholders or officers. Cf. *First Nat. City Bank* v.
*Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611,
625 (1983) ("Separate legal personality has been described
as 'an almost indispensable aspect of the public corpora-
tion'"). It is similarly awkward to refer to a person as an
"organ" of the foreign state. See §1603(b)(2). And the
third part of the definition could not be applied at all to a
natural person. A natural person cannot be a citizen of a
State "as defined in section 1332(c) and (e)," §1603(b)(3),
because those subsections refer to the citizenship of corpo-
rations and estates. Nor can a natural person be "created
under the laws of any third country." *Ibid.*[8] Thus, the

——————

[8] Petitioner points out that §1603(b)(3) describes only which defen-
dants *cannot* be agencies or instrumentalities. He suggests that it
therefore tells us nothing about which defendants *can* be covered by
that term. Brief for Petitioner 46. Even if so, reading §1603(b) as
petitioner suggests would leave us with the odd result that a corpora-
tion that is the citizen of a state is excluded from the definition under
§1603(b)(3), and thus not immune, whereas a natural person who is the
citizen of a state is not excluded, and thus retains his immunity.

terms Congress chose simply do not evidence the intent to
include individual officials within the meaning of "agency
or instrumentality."[9]  Cf. *Dole Food Co.* v. *Patrickson*, 538
U. S. 468, 474 (2003) (describing §1603(b) as containing
"indicia that Congress had corporate formalities in mind").

  Petitioner proposes a second textual route to including
an official within the meaning of "foreign state."  He ar-
gues that the definition of "foreign state" in §1603(a) sets
out a nonexhaustive list that "includes" political subdivi-
sions and agencies or instrumentalities but is not so lim-
ited.  See Brief for Petitioner 22–23.  It is true that use of
the word "include" can signal that the list that follows is
meant to be illustrative rather than exhaustive.[10]  And, to

———————

  [9] Nor does anything in the legislative history suggest that Congress
intended the term "agency or instrumentality" to include individuals.
On the contrary, the legislative history, like the statute, speaks in
terms of entities.  See, *e.g.*, H. R. Rep. No. 94–1487, p. 15 (1976) (here-
inafter H. R. Rep.) ("The first criterion, that the entity be a separate
legal person, is intended to include a corporation, association, founda-
tion, or any other entity which, under the law of the foreign state where
it was created, can sue or be sued in its own name").

  JUSTICE SCALIA may well be correct that it is not strictly necessary to
confirm our reading of the statutory text by consulting the legislative
history, see *post*, at 1–2 (opinion concurring in judgment).  But as the
Court explained some years ago in an opinion authored by Justice
White:

  "As for the propriety of using legislative history at all, common sense
suggests that inquiry benefits from reviewing additional information
rather than ignoring it.  As Chief Justice Marshall put it, '[w]here the
mind labours to discover the design of the legislature, it seizes every
thing from which aid can be derived.' *United States* v. *Fisher*, 2 Cranch
358, 386 (1805).  Legislative history materials are not generally so
misleading that jurists should never employ them in a good-faith effort
to discern legislative intent.  Our precedents demonstrate that the
Court's practice of utilizing legislative history reaches well into its past.
See, *e.g.*, *Wallace* v. *Parker*, 6 Pet. 680, 687–690 (1832).  We suspect
that the practice will likewise reach well into the future." *Wisconsin
Public Intervenor* v. *Mortier*, 501 U. S. 597, 611–612, n. 4 (1991) (altera-
tion in original).

  [10] See 2A N. Singer & J. Singer, Sutherland Statutory Construction

be sure, there are fewer textual clues within §1603(a) than within §1603(b) from which to interpret Congress' silence regarding foreign officials. But even if the list in §1603(a) is merely illustrative, it still suggests that "foreign state" does not encompass officials, because the types of defendants listed are all entities. See *Russell Motor Car Co.* v. *United States*, 261 U. S. 514, 519 (1923) ("[A] word may be known by the company it keeps").

Moreover, elsewhere in the FSIA Congress expressly mentioned officials when it wished to count their acts as equivalent to those of the foreign state, which suggests that officials are not included within the unadorned term "foreign state." Cf. *Kimbrough* v. *United States*, 552 U. S. 85, 103 (2007) ("Drawing meaning from silence is particularly inappropriate . . . [when] Congress has shown that it knows how to [address an issue] in express terms"). For example, Congress provided an exception from the general grant of immunity for cases in which "money damages are sought against a foreign state" for an injury in the United States "caused by the tortious act or omission *of that foreign state or of any official* or employee of that foreign state while acting within the scope of his office." §1605(a)(5) (emphasis added). The same reference to officials is made in a similar, later enacted exception. See 28 U. S. C. A. §1605A(a)(1) (Supp. 2009) (eliminating immunity for suits "in which money damages are sought against a foreign state" for certain acts "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency"); see also §1605A(c) (creating a cause of action against the "foreign state" and "any official, employee, or

––––––––––

§47.7, p. 305 (7th ed. 2007) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation" (some internal quotation marks omitted)).

agent" thereof).[11] If the term "foreign state" by definition includes an individual acting within the scope of his office, the phrase "or of any official or employee . . ." in 28 U. S. C. §1605(a)(5) would be unnecessary. See *Dole Food Co.*, 538 U. S., at 476–477 ("[W]e should not construe the statute in a manner that is strained and, at the same time, would render a statutory term superfluous").

Other provisions of the statute also point away from reading "foreign state" to include foreign officials. Congress made no express mention of service of process on individuals in §1608(a), which governs service upon a foreign state or political subdivision. Although some of the methods listed could be used to serve individuals—for example, by delivery "in accordance with an applicable international convention," §1608(a)(2)—the methods specified are at best very roundabout ways of serving an individual official. Furthermore, Congress made specific remedial choices for different types of defendants. See §1606 (allowing punitive damages for an agency or instrumentality but not for a foreign state); §1610 (affording a plaintiff greater rights to attach the property of an agency or instrumentality as compared to the property of a foreign state). By adopting petitioner's reading of "foreign state," we would subject claims against officials to the more limited remedies available in suits against states,

––––––––––––

[11] Petitioner argues that §1605A abrogates immunity for certain acts by individual officials, which would be superfluous if the officials were not otherwise immune. See Brief for Petitioner 41–43. But the import of §1605A is precisely the opposite. First, §1605A(a)(1) eliminates the immunity of the *state* for certain acts of its officers; it says a "foreign state shall not be immune" in a suit "in which money damages are sought against a foreign state." As it does not expressly refer to the immunity of individual officers, it adds nothing to petitioner's argument. Second, the creation of a cause of action against both the "foreign state" and "any official, employee, or agent" thereof, §1605A(c), reinforces the idea that "foreign state" does not by definition include foreign officials.

without so much as a whisper from Congress on the sub-
ject. (And if we were instead to adopt petitioner's other
textual argument, we would subject those claims to the
different, more expansive, remedial scheme for agencies).
The Act's careful calibration of remedies among the listed
types of defendants suggests that Congress did not mean
to cover other types of defendants never mentioned in the
text.

In sum, "[w]e do not . . . construe statutory phrases in
isolation; we read statutes as a whole." *United States* v.
*Morton*, 467 U. S. 822, 828 (1984). Reading the FSIA as a
whole, there is nothing to suggest we should read "foreign
state" in §1603(a) to include an official acting on behalf of
the foreign state, and much to indicate that this meaning
was not what Congress enacted.[12] The text does not ex-
pressly foreclose petitioner's reading, but it supports the
view of respondents and the United States that the Act
does not address an official's claim to immunity.

## IV

Petitioner argues that the FSIA is best read to cover his
claim to immunity because of its history and purpose. As
discussed at the outset, one of the primary purposes of the
FSIA was to codify the restrictive theory of sovereign
immunity, which Congress recognized as consistent with
extant international law. See §1602. We have observed

---

[12] Nor is it the case that the FSIA's "legislative history does not even
hint of an intent to exclude individual officials," *Chuidian*, 912 F. 2d, at
1101. The legislative history makes clear that Congress did not intend
the FSIA to address position-based individual immunities such as
diplomatic and consular immunity. H. R. Rep., at 12 ("The bill is not
intended . . . . to affect either diplomatic or consular immunity"). It also
suggests that general "official immunity" is something separate from
the subject of the bill. See *id.*, at 23 ("The bill does not attempt to deal
with questions of discovery. . . . [I]f a plaintiff sought to depose a
diplomat in the United States or a high-ranking official of a foreign
government, diplomatic and official immunity would apply").

that a related purpose was "codification of international law at the time of the FSIA's enactment," *Permanent Mission of India to United Nations* v. *City of New York*, 551 U. S. 193, 199 (2007), and have examined the relevant common law and international practice when interpreting the Act, *id.*, at 200–201. Because of this relationship between the Act and the common law that it codified, petitioner argues that we should construe the FSIA consistently with the common law regarding individual immunity, which—in petitioner's view—was coextensive with the law of state immunity and always immunized a foreign official for acts taken on behalf of the foreign state. Even reading the Act in light of Congress' purpose of codifying *state* sovereign immunity, however, we do not think that the Act codified the common law with respect to the immunity of individual officials.

The canon of construction that statutes should be interpreted consistently with the common law helps us interpret a statute that clearly covers a field formerly governed by the common law.[13] But the canon does not help us to decide the antecedent question whether, when a statute's coverage is ambiguous, Congress intended the statute to govern a particular field—in this case, whether Congress intended the FSIA to supersede the common law of official immunity.[14]

—————

[13] Congress "is understood to legislate against a background of common-law . . . principles," *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108 (1991), and when a statute covers an issue previously governed by the common law, we interpret the statute with the presumption that Congress intended to retain the substance of the common law. See *Isbrandtsen Co.* v. *Johnson*, 343 U. S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident").

[14] We find similarly inapposite petitioner's invocation of the canon that a statute should be interpreted in compliance with international law, see *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 118 (1804),

Petitioner argues that because state and official immunities are coextensive, Congress must have codified official immunity when it codified state immunity. See Brief for Petitioner 26–30. But the relationship between a state's immunity and an official's immunity is more complicated than petitioner suggests, although we need not and do not resolve the dispute among the parties as to the precise scope of an official's immunity at common law. The very authority to which petitioner points us, and which we have previously found instructive, see*, e.g.*, *Permanent Mission*, 551 U. S., at 200, states that the immunity of individual officials is subject to a caveat not applicable to any of the other entities or persons[15] to which the foreign state's immunity extends. The Restatement provides that the "immunity of a foreign state . . . extends to . . . any other public minister, official, or agent of the state with respect to acts performed in his official capacity *if the effect of exercising jurisdiction would be to enforce a rule of law against the state*." Restatement §66 (emphasis added).[16]

—————

and his argument that foreign relations and the reciprocal protection of United States officials abroad would be undermined if we do not adopt his reading of the Act. Because we are not deciding that the FSIA bars petitioner's immunity but rather that the Act does not address the question, we need not determine whether declining to afford immunity to petitioner would be consistent with international law.

[15] The Restatement does not apply this caveat to the head of state, head of government, or foreign minister. See Restatement §66. Whether petitioner may be entitled to head of state immunity, or any other immunity, under the common law is a question we leave open for remand. See 552 F. 3d 371, 383 (CA4 2009). We express no view on whether Restatement §66 correctly sets out the scope of the common law immunity applicable to current or former foreign officials.

[16] Respondents contend that this caveat refers to "the compulsive effect of the judgment on the state," Brief for Respondents 42, but petitioner disputes that meaning, Reply Brief for Petitioner 17–18. We need not resolve their dispute, as it is enough for present purposes that the Restatement indicates a foreign official's immunity may turn upon a requirement not applicable to any other type of defendant.

And historically, the Government sometimes suggested immunity under the common law for individual officials even when the foreign state did not qualify. See, *e.g.*, *Greenspan* v. *Crosbie*, No. 74 Civ. 4734 (GLG), 1976 WL 841 (SDNY, Nov. 23, 1976). There is therefore little reason to presume that when Congress set out to codify state immunity, it must also have, *sub silentio*, intended to codify official immunity.

Petitioner urges that a suit against an official must always be equivalent to a suit against the state because acts taken by a state official on behalf of a state are acts of the state. See Brief for Petitioner 26. We have recognized, in the context of the act of state doctrine, that an official's acts can be considered the acts of the foreign state, and that "the courts of one country will not sit in judgment" of those acts when done within the territory of the foreign state. See *Underhill* v. *Hernandez*, 168 U. S. 250, 252, 254 (1897). Although the act of state doctrine is distinct from immunity, and instead "provides foreign states with a substantive defense on the merits," *Altmann*, 541 U. S., at 700, we do not doubt that in some circumstances the immunity of the foreign state extends to an individual for acts taken in his official capacity. But it does not follow from this premise that Congress intended to codify that immunity in the FSIA. It hardly furthers Congress' purpose of "clarifying the rules that judges should apply in resolving sovereign immunity claims," *id.*, at 699, to lump individual officials in with foreign states without so much as a word spelling out how and when individual officials are covered.[17]

—————

[17] The courts of appeals have had to develop, in the complete absence of any statutory text, rules governing when an official is entitled to immunity under the FSIA. For example, Courts of Appeals have applied the rule that foreign sovereign immunity extends to an individual official "for acts committed in his official capacity" but not to "an official who acts beyond the scope of his authority." *Chuidian*, 912

Petitioner would have a stronger case if there were any indication that Congress' intent to enact a comprehensive solution for suits against states extended to suits against individual officials. But to the extent Congress contemplated the Act's effect upon officials at all, the evidence points in the opposite direction. As we have already mentioned, the legislative history points toward an intent to leave official immunity outside the scope of the Act. See n. 12, *supra*. And although questions of official immunity did arise in the pre-FSIA period, they were few and far between.[18] The immunity of officials simply was not the particular problem to which Congress was responding when it enacted the FSIA. The FSIA was adopted, rather, to address "a modern world where foreign state enterprises are every day participants in commercial activities," and to assure litigants that decisions regarding claims against states and their enterprises "are made on purely legal grounds." H. R. Rep., at 7. We have been given no reason to believe that Congress saw as a problem, or wanted to eliminate, the State Department's role in determinations regarding individual official immunity.[19]

————

F. 2d, at 1103, 1106. That may be correct as a matter of common-law principles, but it does not derive from any clarification or codification by Congress. Furthermore, if Congress intended the FSIA to reach individuals, one would expect the Act to have addressed whether *former* officials are covered, an issue it settled with respect to instrumentalities, see *Dole Food Co.* v. *Patrickson*, 538 U. S. 468, 478 (2003) ("[I]nstrumentality status [must] be determined at the time suit is filed").

[18] A study that attempted to gather all of the State Department decisions related to sovereign immunity from the adoption of the restrictive theory in 1952 to the enactment of the FSIA reveals only four decisions related to official immunity, and two related to head of state immunity, out of a total of 110 decisions. Sovereign Immunity Decisions of the Dept. of State, May 1952 to Jan. 1977 (M. Sandler, D. Vagts, & B. Ristau eds.), in Digest of U. S. Practice in Int'l Law 1020, 1080 (1977) (hereinafter Digest).

[19] The FSIA was introduced in accordance with the recommendation

Opinion of the Court

Finally, our reading of the FSIA will not "in effect make the statute optional," as some Courts of Appeals have feared, by allowing litigants through "artful pleading . . . to take advantage of the Act's provisions or, alternatively, choose to proceed under the old common law," *Chuidian* v. *Philippine Nat. Bank,* 912 F. 2d 1095, 1102 (CA9 1990). Even if a suit is not governed by the Act, it may still be barred by foreign sovereign immunity under the common law. And not every suit can successfully be pleaded against an individual official alone.[20] Even when a plaintiff names only a foreign official, it may be the case that the foreign state itself, its political subdivision, or an agency or instrumentality is a required party, because

_____

of the State Department. H. R. Rep., at 6. The Department sought and supported the elimination of its role with respect to claims against foreign states and their agencies or instrumentalities. See Hearings on H. R. 11315 before the Subcommittee on Administrative Law and Governmental Relations of the House of Representatives Committee on the Judiciary, 94th Cong., 2d Sess., 34 (1976) (testimony of Monroe Leigh, Legal Adviser, Dept. of State) ("[I]t is our judgment . . . that the advantages of having a judicial determination greatly outweigh the advantage of being able to intervene in a lawsuit"). But the Department has from the time of the FSIA's enactment understood the Act to leave intact the Department's role in official immunity cases. See Digest 1020 ("These decisions [of the Department regarding the immunity of officials] may be of some future significance, because the Foreign Sovereign Immunities Act does not deal with the immunity of individual officials, but only that of foreign states and their political subdivisions, agencies and instrumentalities").

[20] Furthermore, a plaintiff seeking to sue a foreign official will not be able to rely on the Act's service of process and jurisdictional provisions. Thus, a plaintiff will have to establish that the district court has personal jurisdiction over an official without the benefit of the FSIA provision that makes personal jurisdiction over a foreign state automatic when an exception to immunity applies and service of process has been accomplished in accordance with 28 U. S. C. §1608. See §1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a)," *i.e.*, claims for which the foreign state is not entitled to immunity, "where service has been made under section 1608 of this title").

that party has "an interest relating to the subject of the action" and "disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. Rule Civ. Proc. 19(a)(1)(B). If this is the case, and the entity is immune from suit under the FSIA, the district court may have to dismiss the suit, regardless of whether the official is immune or not under the common law. See *Republic of Philippines* v. *Pimentel*, 553 U. S. 851, 867 (2008) ("[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign"). Or it may be the case that some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest. Cf. *Kentucky* v. *Graham*, 473 U. S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity" (citation omitted)).

We are thus not persuaded that our construction of the statute's text should be affected by the risk that plaintiffs may use artful pleading to attempt to select between application of the FSIA or the common law. And we think this case, in which respondents have sued petitioner in his personal capacity and seek damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign state as the Act defines that term. Although Congress clearly intended to supersede the common-law regime for claims against foreign states, we find nothing in the statute's origin or aims to indicate that Congress similarly wanted to codify the law of foreign official immunity.

## V

Our review of the text, purpose, and history of the FSIA leads us to the conclusion that the Court of Appeals correctly held the FSIA does not govern petitioner's claim of immunity. The Act therefore did not deprive the District Court of subject-matter jurisdiction. We emphasize, however, the narrowness of our holding. Whether petitioner may be entitled to immunity under the common law, and whether he may have other valid defenses to the grave charges against him, are matters to be addressed in the first instance by the District Court on remand. The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1555

———————

## MOHAMED ALI SAMANTAR, PETITIONER *v.* BASHE ABDI YOUSUF ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 1, 2010]

JUSTICE ALITO, concurring.

I join the opinion of the Court, although I think that the citations to legislative history are of little if any value here.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1555

_____

## MOHAMED ALI SAMANTAR, PETITIONER *v.* BASHE ABDI YOUSUF ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 1, 2010]

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I join the Court's opinion except for those parts relying on the legislative history of the Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §§1330, 1602, *et seq.* In my view, the Court's textual analysis is sufficient to resolve this case. See *post*, at 1–4 (SCALIA, J., concurring in judgment).

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1555

_____

## MOHAMED ALI SAMANTAR, PETITIONER *v.* BASHE ABDI YOUSUF ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 1, 2010]

JUSTICE SCALIA, concurring in the judgment.

The Court's admirably careful textual analysis, *ante*, at 7–13, demonstrates that the term "foreign state" in the provision "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," 28 U. S. C. §1604, does not include foreign officials. Yet the Court insists on adding legislative history to its analysis. I could understand that (though not agree with it) if, in the absence of supposed legislative-history support, the Court would reach a different result. Or even if there was something in the legislative history that clearly contradicted the Court's result, and had to be explained away. That is not the situation here (or at least the Court's opinion does not think it to be so). The Court assures us, however (if this could be thought assurance), that legislative history is "'not generally so misleading'" that it should "'never'" be used. *Ante*, at 10, n. 9 (quoting *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597, 611–612, n. 4 (1991)). Surely that is damning by faint praise. And the Court's mention of the past practice of using legislative history, *ante*, at 10, n. 9, does not support the Court's use of it today. The past practice was "*not* the practice of using legislative history for the purpose of giving authoritative content to the meaning of a statutory text," *Mortier*, *supra*, at 622 (SCALIA, J., concurring in

judgment).

The Court's introduction of legislative history serves no purpose except needlessly to inject into the opinion a mode of analysis that not all of the Justices consider valid. And it does so, to boot, in a fashion that does not isolate the superfluous legislative history in a section that those of us who disagree categorically with its use, or at least disagree with its superfluous use, can decline to join. I therefore do not join the opinion, and concur only in the result.

The Court relies on legislative history to support three of its positions. First, after explaining why the phrase "agency or instrumentality" in the definition of "foreign state," see §1603(a), (b), does not refer to natural persons, *ante*, at 9–10, the Court says "[n]or does anything in the legislative history suggest that Congress intended the term 'agency or instrumentality' to include individuals," *ante*, at 10, n. 9. According to the Court, "the legislative history, like the statute, speaks in terms of entities." *Ibid.* Apparently, the legislative history must be consulted, not to show that it *supports* the Court's textual analysis, or even to explain why its seeming contradiction of the Court's analysis is inconsequential, but to show nothing more than that it contains the same ambiguous language as the text. This is beyond all reason.

Second, after concluding its review of the statute's text, the Court states that the "legislative history makes clear that Congress did not intend the [Foreign Sovereign Immunities Act of 1976] to address position-based individual immunities such as diplomatic and consular immunity," *ante*, at 13, n. 12. See also *ante*, at 17. It cites for this proposition a House Committee Report that we have no reason to believe was read (much less approved) by the Senate—or, indeed, by the Members of the House who were not on the Committee—or even, for that matter, by the members of the Committee, who never voted on the Report. In any case, the quoted excerpt does not address

"position-based individual immunities" in general but only "consular and diplomatic immunity," which is not at issue here. Unless consular and diplomatic immunity, on the one hand, and, on the other hand, what *is* at issue here— state-agent immunity—are always treated the same (which I doubt and the Court does not attempt to establish), the passage contributes nothing to analysis of the present case.

The same footnote also quotes a portion of the same House Report as follows:

"'The bill does not attempt to deal with questions of discovery. . . . [I]f a plaintiff sought to depose a diplomat in the United States or a high-ranking official of a foreign government, diplomatic and official immunity would apply.'" *Ante*, at 13, n. 12.

If anything, this passage cuts against the Court's result. The two sentences omitted from the above quotation read as follows:

"Existing law appears to be adequate in this area. For example, if a private plaintiff sought the production of sensitive governmental documents of a foreign state, concepts of governmental privilege would apply." H. R. Rep. No. 94–1487, p. 23 (1976).

Thus, the House Report makes it clear that the bill's failure to deal with discovery applies to *both* discovery against sovereigns *and* discovery against foreign officials. But the latter would have been unnecessary if the bill dealt only with sovereigns. The implication (if any) is that the bill's provisions regarding immunity from suit apply to both sovereigns and foreign officials.

Third, and finally, the Court points to legislative history to establish the purpose of the statute. See *ante*, at 17, and n. 19. This is particularly puzzling, because the *enacted* statutory text itself includes findings and a declara-

tion of purpose—the very same purpose (surprise!) that the Court finds evidenced in the legislative history. See 28 U. S. C. §1602. To make matters worse, the Court itself notes this statutory declaration of purpose twice earlier, in the body of its opinion, see *ante*, at 6, 13. If those textual references to the statute itself were deleted, the footnoted citation of legislative history would at least perform some function. As it is, however, it adds nothing except the demonstration of assiduous law-clerk research.

It should be no cause for wonder that, upon careful examination, all of the opinion's excerpts from legislative history turn out to be, at best, nonprobative or entirely duplicative of text. After all, legislative history is almost never the real reason for the Court's decision—and make-weights do not deserve a lot of the Court's time.