**In re GRAND JURY PROCEEDING RELATED TO M/V DELTUVA.**

**Misc. No. 10–223 (DRD).**

United States District Court,
D. Puerto Rico.

Nov. 3, 2010.

---

### OPINION AND ORDER

DANIEL R. DOMINGUEZ, District Judge.

### I. PROCEDURAL HISTORY

On July 8, 2010, Lithuanian Shipping Company (hereinafter referred to as "LSC") filed a motion to quash (Docket No. 1) a grand jury subpoena dated June 10, 2010. Therein, LSC requests that the Court quash the grand jury subpoena directed at LSC, arguing that LSC is an agency or instrumentality of the Republic of Lithuania and, as a result, is immune from the grand jury's jurisdiction pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* Specifically, LSC argues that it is an agency or instrumentality of the Republic of Lithuania because the government of Lithuania owns a majority of its shares. Accordingly, LSC asserts immunity from the Court's criminal subject matter jurisdiction pursuant to the FSIA as that act of Congress only grants the Court subject matter jurisdiction over non-jury civil actions and actions against foreign states where a specified exception to immunity exists. Thus, LSC argues that the grand jury is barred from exercising jurisdiction over LSC and, hence, that the grand jury subpoena issued to LSC should be quashed.

On August 4, 2010, the United States filed a response to the motion to quash (Docket No. 6). The United States asserts therein that LSC's Motor Vessel Deltuva (hereinafter referred to as the "M/V Deltuva") is not entitled to sovereign immunity as it was engaged in commercial service and as the FSIA does not apply to criminal investigations or actions. The United States cites the 1958 Geneva Conventions of the High Seas and Territorial Sea and the Contiguous Zone for the proposition that foreign state owned commercial vessels are not entitled to sovereign immunity under applicable internal law. Further, the United States asserts that the violation currently before the grand jury relates to the International Convention for the Prevention of Pollution from Ships ("MARPOL"), which also provides jurisdiction in the instant case. Additionally, the United States alleges that the FSIA does not ap-

ply to criminal investigations and, therefore, does not preclude a finding that the Court and Grand Jury possess subject matter jurisdiction. Moreover, the United States argues that, although the FSIA is inapplicable to criminal proceedings, it supports a finding that commercial instrumentalities of foreign governments, such LSC, are not immune from punitive measures based on their commercial activities in the United States. Finally, the United States asserts that, when the Agreement on Security was executed to release the M/V Deltuva, it contained a provision that forbids the signatory from objecting to the Court's exercise of personal jurisdiction over any criminal actions resulting from the United States' investigation.

On August 20, 2010, LSC filed a reply to the United States' response to the motion to quash (Docket No. 9). LSC first argues that the 1958 Geneva Convention on the High Seas and the Convention on the Territorial Sea and Contiguous Zone were superseded by the 1982 United Nations Convention on the Law of the Sea ("UNCLOS"), which the United States has yet to ratify. Further, LSC asserts that, even if the Court applies the unratified UNCLOS as customary international law, this convention does not support the assertion of jurisdiction by this Court as the instant controversy surrounds the alleged discharge of bilge wastes on the high seas, rather than in U.S. jurisdictional waters. Thus, LSC argues, the U.S. must refer the investigation to Lithuania for investigation, as it is the flag state for the vessel involved. Further, LSC reasserts its argument that foreign states and their instruments are immune from criminal prosecution, citing the text of the FSIA and the Antiterrorism and Effective Death

Penalty Act of 1996, Pub. L. No. 104–132, 110 State. 1214, as support for their argument. Finally, LSC avers that the Agreement on Security was entered into under duress[1] and, further, contains a provision stating that entering into the Agreement would not result in "prejudice as to all rights or defenses" or in their waiver except as expressly set forth in the Agreement.

## II. RELEVANT FACTUAL BACKGROUND

The M/V Deltuva is an ocean-going general cargo ship owned and managed by LSC. In turn, LSC is a public company organized and existing under the laws of the Republic of Lithuania. Of the total outstanding shares of LSC, the Republic of Lithuania owns 61.42%, and is therefore the majority shareholder/owner of LSC, exercising a majority of the voting stock in the company. In fact, LSC was formed for the express purpose of enabling the Republic of Lithuania to own and manage ocean going cargo vessels. In turn, the vessel's purpose is to further official Lithuanian state economic policies and purposes. The M/V Deltuva flies the flag of Lithuania and its master and officers are citizens of that country.

On April 21, 2010, the M/V Deltuva called at San Juan, Puerto Rico, where she was boarded by personnel from the United States Coast Guard, who performed a Port State Control inspection and issued a report corresponding to the inspection. In conjunction with this inspection, the Coast Guard performed interviews, both on board the vessel and at the offices of the Coast Guard Investigative Service in Old San Juan after discovering evidence indicating that the crew of the vessel had

---

**1.** The Court notes that no specific factual evidence as to LSC's broad allegations of duress as to the Agreement on Security was provided. Rather, LSC merely points to the detention of the vessel in supposed violation of the FSIA to assert the existence of duress.

engaged in the illegal dumping of oil at sea and concomitant falsification of on-board log books to camouflage evidence of an alleged oil spill. At the time, the M/V Deltuva was not engaged in official activities on behalf of the government of Lithuania, but was carrying a commercial cargo bound for the United States.

On May 5, 2010, the Coast Guard asserted that it had reasonable cause to believe that the M/V Deltuva was subject to criminal fines and/or civil penalties for violating the Act to Prevent Pollution from Ships. At that time, the Coast Guard instructed the United States Customs and Border Protection to withhold the customs clearance for the vessel.

On May 17, 2010, LSC sent the United States Coast Guard a formal request to release the M/V Deltuva immediately, asserting that the vessel was wholly owned by an instrumentality of the Republic of Lithuania, whose assets are immune from arrest or attachment and which is not subject to the jurisdiction of U.S. courts in criminal matters. The Coast Guard rejected this request and informed LSC that the vessel would remain detained until an surety agreement was executed.

On May 10, 2010, the Lithuanian Ministry of Transportation sent a diplomatic note to the United States Department of Homeland Security confirming that the M/V Deltuva was owned and managed by LSC, which, in turn, was owned in its majority by the Republic of Lithuania. The note thus requested that the Department of Homeland Security facilitate the release of the vessel. The Department of Homeland Security chose not to act upon this note and continued to detain the vessel.

On May 24, 2010, after no action was taken by the U.S. government to release the vessel, LSC executed an Agreement on Security (hereinafter referred to as "the Agreement"). The Agreement did not contain an express waiver of sovereign immunity. It did, however, contain a provision that the Agreement was executed "without prejudice as to all rights or defenses which the Vessel and/or the Owner of the Vessel and/or the Operator of the Vessel may have, none of which is to be regarded as waived, except Owner and/or Operator any objections to in *personam jurisdiction* over them, and *in rem* jurisdiction over the Vessel with respect to the potential claims of the United States in the United States District Court which hears the criminal action." Further, the Agreement stipulated that "the Owner and Operator agree to assist the United States, consistent with U.S. law and the law of such country that any crewmember is found, in arranging proper service of grand jury and/or trial subpoenas to those officers and crewmembers employed by the Owner and Operator who are not in the United States at the time the subpoena is issued."

Subsequently, the United States Coast Guard referred the investigation as to the M/T Deltuva to the Department of Justice for criminal prosecution. On June 10, 2010, a grand jury subpoena addressed to LSC was issued by this Court, requiring LSC to appear before the Grand Jury with certain documents generated or maintained by LSC relating to the management of the M/V Deltuva.

## III. THE FOREIGN SOVEREIGN IMMUNITIES ACT

At the outset, the Court notes that, in their filings, the parties delve into the applicability of various instruments of international law and U.S. criminal statutes to the facts as alleged herein. The Court finds that such an inquiry is appropriate at the motion to dismiss phase, rather than at this preliminary phase, before the Grand

Jury has even passed down an indictment to challenge. *See* FED.R.CRIM.P. 6 (Federal Rule of Criminal Procedure relating to the Grand Jury, including motions to dismiss indictment). The Court thus expressly declines to issue a ruling regarding the applicability facts alleged thus far in the instant case to principles of either domestic or international law as it finds such a ruling to be premature.

Accordingly, the Court finds that, despite the parties' discussion of various international treaties and conventions in their respective filings, the true inquiry before the Court at this time relates solely to the exercise of subject matter jurisdiction over LSC by this Court, and, by extension, the grand jury. Thus, the Court's sole inquiry at this time is whether principles of sovereign immunity as enunciated by the FSIA shield LSC, an instrumentality of the Republic of Lithuania, from the Court's exercise of criminal subject matter jurisdiction [2] in the instant case.

 "Although grand jury subpoenas are issued in the name of the district court, they are issued pro forma and in blank . . . [and] are in fact almost universally instrumentalities of the United States Attorney's office." *In Re Grand Jury Matters*, 751 F.2d 13, 16 (1st Cir.1984)(internal citations and quotations omitted). Accordingly, to counterbalance the potential abuse of these subpoenas, "Fed.R.Crim.P. 17(c) gives the district court, on motion, the power to quash or modify a subpoena duces tecum if compliance would be unreasonable or oppressive." *Id.* (internal quotation omitted). The grand jury's investigative powers are broad and are founded on the principal that "the public has a right to every man's evidence, except for those persons protected by a constitutional, com-

mon-law or statutory privilege." *Id.* (quoting *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1919))(internal quotations omitted). Where no privilege is asserted, "courts normally will ask only whether the materials requested are relevant to the investigation, whether the subpoenas specify the materials to be produced with reasonable particularity, and whether the subpoena commands production of materials covering only a reasonable period of time." *Id.*

In the instant case, it appears that LSC invokes a statutory source of privilege, namely the FSIA, in its endeavor to convince the Court to quash the subpoena issued for information relating to the handling of oil, including potential spillages, and maintenance of oil logs on the M/V Deltuva. Thus, the Court's inquiry shall first ascertain whether this statutory privilege indeed exists and, if it finds that it does not, shall determine whether the challenged subpoena related to relevant materials limited to a reasonable period of time and referenced with reasonable particularity.

The true heart of the instant controversy is whether the FSIA applies to criminal cases. LSC argues that this act of Congress effectively bars all cases, both civil and criminal, against foreign sovereigns and their instrumentalities, unless the case falls within one of the exceptions specifically enumerated by the Act. The United States, however, asserts that the FSIA does not apply to criminal cases and that, therefore, the Court may exercise jurisdiction over LSC. In the alternative, the United States argues that, even if the FSIA applies to criminal cases, it would not block the Court's exercise of subject

---

**2.** As correctly stated by the United States in their response to the motion to quash, 18 U.S.C. § 3231 provides that "[t]he district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States."

matter jurisdiction in the instant case as the action under investigation was a result of a commercial activity carried out by LSC.

In the early history of this nation, "the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Thus, the United States extended "virtually absolute immunity to foreign sovereigns as a matter of grace and comity." *Samantar v. Yousuf*, —— U.S. ——, 130 S.Ct. 2278, 2284, 176 L.Ed.2d 1047 (2010)(quoting *Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962)(internal quotation omitted). However, in the 1952 Tate Letter, the Department of State announced its adoption of a "restrictive theory" of foreign sovereign immunity, under which immunity existed only in relation to a foreign state's public acts and did not extend to commercial acts. *Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962. A multitude of complications arose in the application of this new "restrictive theory" by the courts of this nation and, as a result, the governing standards for foreign sovereign immunity were "neither clear nor uniformly applied." *Id.* at 487–88; *see also Samantar*, 130 S.Ct. at 2285. In response to the general disarray caused by application of the "restrictive theory," Congress enacted the FSIA in 1976, setting forth "a comprehensive set of legal standards governing claims of immunity in every **civil action** against a foreign state or its political subdivisions, agencies or instrumentalities." *Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962 (emphasis ours); *see also Samantar*, 130 S.Ct. at 2285 (discussing the historical backdrop for the FSIA).

Specifically, the FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States" except as otherwise provided in the Act. 28 U.S.C. § 1604. Thus, "[t]he Act, if it applies, is the sole basis for obtaining jurisdiction over a foreign state in federal court." *Samantar*, 130 S.Ct. at 2286 (quoting *Argentine Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989))(internal quotation omitted).

In the instant case, it is undisputed that LSC is an agency or instrumentality of the Republic of Lithuania, which owns a majority of the voting stock of that company and uses the company to represent its economic interests abroad. Thus, if the Court finds that the Act governs criminal as well as civil actions brought in the courts of the United States, it shall act to bar subject matter jurisdiction over a criminal action against LSC unless an exception to the Act applies. *See e.g. Verlinden*, 461 U.S. at 488, 103 S.Ct. 1962 ("A foreign state is normally immune from the jurisdiction of federal and state courts [under the FSIA], subject to a set of exceptions specified in §§ 1607 and 1607.")

At this time, neither the Supreme Court of the United States nor any federal court of appeals has directly decided whether the FSIA applies to criminal actions as well as civil actions. Parties have cited two district court cases which address this issue. However, these two cases are directly at odds with each other.

In *Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd.*, the Northern District of Ohio discussed the application of FSIA to criminal actions in the context of a civil RICO case. 750 F.Supp. 838 (N.D.Ohio 1990). The Court in that case looked to the legislative history behind the FSIA, which states that the Act "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity and prescribes the jurisdiction of United States district courts in cases involving

foreign states" to find that the FSIA is the only method for obtaining jurisdiction over foreign sovereigns in both civil and criminal actions. *Id.* at 843–44 (quoting S.Rep. No. 1310, 94th Cong., 2d Sess. 11–12, *reprinted in* 1976 U.S.CODE CONG. & ADMIN. NEWS 6604, 6610). The Court in that case also noted that the *Argentine Republic* Court did not expressly limit its finding that the FSIA provides the sole source of jurisdiction over foreign nations to civil cases in support of its ultimate conclusion.

A few years later, however, in *United States v. Hendron,* the Eastern District of New York reached the opposite conclusion when deciding the issue in the context of the criminal prosecution of an officer of a Polish corporation. 813 F.Supp. 973 (E.D.N.Y.1993). That Court conducted an extensive survey of the text of the Act itself, as well as its legislative history in order to determine that the FSIA applies only in the context of civil actions. *Id.* Specifically, the Court observed that the Act itself refers to "foreign states and litigants," noting that the term "litigant" refers to a party in a civil suit, rather than a government prosecutor in the criminal context. *Id.* at 975. Further, the Court found that the text of the Act contained language which describes civil judgments, rather than criminal judgments, and that the Act only discussed damages which pertain to civil actions. *Id.* The Court also noted that the Act discussed counterclaims, which are only available in civil actions, as well as timetables and procedures which only apply to civil suits. *Id.* Next, the Court reviewed the legislative history of the FSIA and found that it "gives no hint that Congress was concerned that a foreign defendant in a criminal proceeding would invoke the Act to avoid a federal court's jurisdiction." *Id.* at 976.

The Court also finds it pertinent to note that at least one Supreme Court case strongly hints that the *Hendron* decision represents the correct interpretation of the FSIA and that this Act does not control the application of foreign sovereign immunity to criminal proceedings. As highlighted in the quote above, the *Verlinden* court specified that the FSIA governs "claims of immunity in every *civil* action against a foreign state." 461 U.S. at 488, 103 S.Ct. 1962 (emphasis ours). At least one other circuit has also indicated that it embraces this view. *See United States v. Noriega,* 117 F.3d 1206, 1212 (11th Cir. 1997)("[T]he FSIA addresses neither head-of-state immunity, nor foreign sovereign immunity in the criminal context.")

■ In light of the Supreme Court's language in *Verlinden,* as well as the Eleventh Circuit's proclamation in *Noriega,* the Court elects to follow the opinion of the *Hendron* court in finding that the FSIA does not govern criminal actions against foreign sovereigns, their agents or instrumentalities. Like the *Hendron* court before it, the Court finds no indication in the legislative history of the Act that Congress intended for the Act to govern criminal actions as well as civil actions. *See* S.Rep. No. 1310, 94th Cong., 2d Sess. 11–12, *reprinted in* 1976 U.S.CODE CONG. & ADMIN. NEWS 6604, 6610 (stating that the Act's purpose was to "provide when and how parties can maintain a lawsuit against a foreign state or its entities"). Additionally, the Court finds that the various provisions of the Act outline principles of civil procedure and civil remedies and, further, states that Congress intends it to govern the proceedings between foreign states and civil litigants. *See* 28 U.S.C. §§ 1602, 1606, 1607, 1608 & 1609. Thus, the Court sees no indication that Congress intended for the FSIA to govern criminal proceedings against agencies or instrumentalities

of foreign governments. Consequently, the Court elects to follow the *Hendron* decision and declines to follow the *Gould* decision. Accordingly, the Court finds that the FSIA does not shield LSC from exercise of this Court's general criminal subject matter jurisdiction.[3]

 As the Court finds no constitutional, statutory or common-law grounds for quashing the grand jury subpoena, the remaining inquiry is narrowed to whether the material sought is relevant to the investigation, properly specified and covers a reasonable period of time. *See In Re Grand Jury Matters,* 751 F.2d at 16. The parties provide scant details regarding the material included in the grand jury subpoena and LSC does not allege any deficiencies in reasonableness, specificity or relevance. The only information before the Court indicates that the documents requested relate to oil logs and the handling of oil upon the M/V Deltuva. As the instant investigation involves the allegedly illegal dumping of oil at sea, to which the documents sought are reasonably related, the Court finds no reason to quash the subpoena based upon the scant information before it. Accordingly, the Court **DENIES** LSC's motion to quash (Docket No. 1).

## IV. CONCLUSION

For the reasons set forth above, the Court hereby **DENIES** LSC's motion to quash the Grand Jury subpoena (Docket No. 1).

**IT IS SO ORDERED.**

---

3. The Court also finds it appropriate to note that, even if the FSIA were to apply, as the M/V Deltuva was engaged in delivering a commercial shipment of goods to the United States at the time when it was detained, the commercial activity exception to the FSIA would likely apply in the instant case to grant this Court subject matter jurisdiction. *See* 28 U.S.C. § 1605(a)(2).