# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 7, 2015              Decided March 4, 2016

No. 14-5297

FEDERAL ELECTION COMMISSION,
APPELLEE

v.

CRAIG FOR U.S. SENATE AND LARRY E. CRAIG,
INDIVIDUALLY, AND IN HIS OFFICIAL CAPACITY AS TREASURER
OF CRAIG FOR U.S. SENATE,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00958)

*Andrew D. Herman* argued the cause for appellants. With him on the briefs were *Aiysha S. Hussain* and *Stanley M. Brand*.

*Kevin P. Hancock*, Attorney, Federal Election Commission, argued the cause for appellee. With him on the brief were *Kevin Deeley*, Acting Associate General Counsel, *Harry J. Summers*, Assistant General Counsel, and *Robert W. Bonham III*, Senior Attorney.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: The Federal Election Commission alleges that former Senator Larry E. Craig, his campaign committee, and the committee's Treasurer converted campaign funds to the Senator's personal use in violation of the Federal Election Campaign Act. That conversion occurred, the Commission contends, when the appellants spent campaign funds to pay legal fees the Senator incurred in connection with efforts to withdraw his guilty plea to a criminal charge of disorderly conduct. The district court granted summary judgment on the Commission's complaint and ordered Senator Craig to disgorge $197,535 to the U.S. Treasury and pay a civil penalty of $45,000. We affirm the court's grant of summary judgment and its remedial orders.

I

Larry E. Craig represented Idaho in the United States Senate from 1991 to 2009. On June 11, 2007, he was flying from Idaho to Washington, D.C., with a stop for a connecting flight at the Minneapolis-St. Paul International Airport. During that stop, a police officer arrested the Senator in the airport bathroom on charges of disorderly conduct and interference with privacy. On August 1, Craig signed and mailed the Minnesota state authorities a plea agreement, pursuant to which he pled guilty to a criminal misdemeanor charge of disorderly conduct and paid a fine and costs totaling $575.

The details of Senator Craig's arrest and plea soon became public. On Monday, August 27, *Roll Call*, a newspaper that covers the United States Congress, obtained the June 11 arrest report and published an article headlined, "Craig Arrested, Pleads Guilty Following Incident in Airport Restroom." J.A. 225-26. Within a day, Senators and a congressional watchdog

group were urging the Senate Select Committee on Ethics (the Senate Ethics Committee) to investigate. At the request of the Senate Republican leadership, Senator Craig stepped down from his committee leadership positions. On August 30, in response to questions about the arrest, the airport police released an audiotape of Craig's interview with the arresting officer.

Two days later, on September 1, the Senator announced that he would resign from the Senate effective September 30. On September 5, his attorneys submitted a letter to the Senate Ethics Committee arguing that the arrest fell outside the Committee's jurisdiction because the arrest was for "purely personal conduct unrelated to the performance of official Senate duties." Letter from Brand Law Group to Hon. Barbara Boxer, Chairwoman, Senate Ethics Comm. (Sept. 5, 2007) (J.A. 179).

The following Monday, September 10, Senator Craig filed a motion with the Minnesota state trial court to withdraw his guilty plea. The court denied the motion on October 4. That same day, the Senator announced that he had reconsidered his plan to resign. He said he would serve the remaining fifteen months of his Senate term, which he did, retiring from the Senate in January 2009.

Also on October 4, the Senator's attorneys advised him that "it is clear that [Federal Election Commission] advisory opinions authorize full payment with campaign funds for legal representation in all matters before the Senate Ethics Committee." Letter from Brand Law Group to Hon. Larry E. Craig (Oct. 4, 2007) (J.A. 155). They further "conclude[d] that all expenses incurred for . . . legal representation in Minnesota state court are . . . fully payable with campaign funds," but warned that there were "no directly applicable [Commission] opinions" addressing that issue. *Id.*

4

A few weeks later, on October 29, Senator Craig's campaign committee, Craig for U.S. Senate (the Craig Committee), made the first in a series of payments to attorneys for legal costs arising from the Senator's efforts to withdraw his guilty plea. Those payments would continue while the Senator appealed the decision of the Minnesota trial court. The Minnesota appellate court would ultimately reject that appeal in December 2008.

In February 2008, the Senate Ethics Committee issued a "Public Letter of Admonition" to Senator Craig. Among other things, the letter warned that the costs associated with the Senator's efforts to withdraw his plea "may not be deemed to have been incurred in connection with your official duties, either by the Committee or by the Federal Election Commission." Letter from Senate Ethics Comm. to Hon. Larry E. Craig (Feb. 13, 2008) (J.A. 236).

In November 2008, the Federal Election Commission (FEC) received an administrative complaint alleging that Senator Craig had unlawfully spent campaign funds on legal fees related to his arrest and conviction. On the basis of the Senator's response and the then-available information, the Commission identified three categories of campaign disbursements at issue: for legal fees incurred in connection with the Senate Ethics Committee's inquiry, for public relations fees incurred in responding to press inquiries, and for legal fees incurred in connection with the Senator's attempt to withdraw his guilty plea. The FEC determined that disbursements in the first two categories were permissible, but it found "reason to believe" that Craig's use of campaign funds to pay legal expenses in connection with the attempt to withdraw the guilty plea "constitute[d] impermissible use . . . in violation of" the Federal Election Campaign Act (FECA). Reason to Believe Finding, Factual and Legal Analysis, *In re Larry E. Craig*, Matter Under Review 6128, at

11 (J.A. 73); *see id*. at 8-13 (J.A. 70-75); *see also* 52 U.S.C. § 30109(a)(2) (regarding "reason to believe" findings).

After conducting an investigation, the Commission voted 5-0 (with one Commissioner recused) to find "probable cause to believe" that Senator Craig, the Craig Committee, and Kaye L. O'Riordan as Treasurer had violated FECA. *See* 52 U.S.C. § 30109(a)(4) (regarding "probable cause to believe" findings). Thereafter, the FEC attempted to correct the violation through the informal conciliation process prescribed by the statute. *Id*. § 30109(a)(4)(A)(i). Unable to secure an acceptable conciliation agreement, the Commission voted 5-0 (again, with one Commissioner recused) to authorize the current litigation. *See* FEC Compl. ¶¶ 28-30 (J.A. 59-60).

FECA provides that, "[i]f the Commission is unable to correct or prevent any violation of this Act" by informal conciliation, "the Commission may, upon an affirmative vote of 4 of its members, institute a civil action for relief" in United States district court. 52 U.S.C. § 30109(a)(6)(A). On June 11, 2012, the Commission filed this lawsuit against defendants Craig, the Craig Committee, and then-Treasurer O'Riordan. After O'Riordan resigned as Treasurer, Senator Craig assumed the position. He has since been substituted for O'Riordan as a defendant in that official capacity as well.

The FEC's complaint charged that the defendants violated FECA, 52 U.S.C. § 30114(b), by disbursing more than $200,000 in campaign contributions to the Sutherland, Asbill & Brennan and Kelly & Jacobson law firms to pay for legal expenses incurred in connection with efforts to withdraw Senator Craig's guilty plea. The FEC sought declaratory and injunctive relief, disgorgement by Senator Craig of all improper disbursements, and the assessment of civil penalties.

The defendants filed a motion to dismiss, which the district court denied. *FEC v. Craig for U.S. Senate*, 933 F. Supp. 2d 111 (D.D.C. 2013). The following year, the court granted the FEC's motion for summary judgment, holding that the defendants had violated FECA's ban on converting campaign funds to personal use. *FEC v. Craig for U.S. Senate*, 70 F. Supp. 3d 82 (D.D.C. 2014). The defendants' -- now appellants' -- first challenge is to this holding, which we review in Parts II and III.

The district court also ordered Senator Craig to disgorge the value of the improperly spent funds to the U.S. Treasury. The court fixed the amount of such funds at $197,535. In addition, it imposed a civil penalty of $45,000. The appellants challenge both the disgorgement and the civil penalty orders. We address those challenges in Part IV.

## II

The district court held that, by using campaign contributions to fund the legal battle to withdraw the Senator's guilty plea, Senator Craig and the Craig Committee violated 52 U.S.C. § 30114(b). We review the district court's grant of summary judgment de novo. *Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 295 (D.C. Cir. 2013). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## A

FECA contains a list of "[p]ermitted uses" for campaign contributions. 52 U.S.C. § 30114(a). As relevant here, such uses include payments for "ordinary and necessary expenses incurred in connection with duties of the individual as a holder

of Federal office," *id.* § 30114(a)(2), and expenditures "for any other lawful purpose unless prohibited by subsection (b) of this section," *id.* § 30114(a)(6).

The district court first held that the appellants' expenditures were not permitted under § 30114(a)(2) because "legal expenses incurred in withdrawing a plea to personal criminal conduct . . . could not be characterized as ordinary and necessary expenses in connection with Senator Craig's duties as an officeholder." *Craig for U.S. Senate*, 70 F. Supp. 3d at 88 (internal quotation marks omitted). The court then held that the expenditures were also impermissible under § 30114(a)(6) because the use of campaign contributions to cover such legal expenses is prohibited by § 30114(b). Appellants challenge only the latter holding. *See* Reply Br. 3, 5. Our inquiry is therefore limited to whether Senator Craig's use of campaign contributions constituted a "prohibited use" under § 30114(b).

Section 30114(b)(1) prohibits "conver[sion]" of campaign contributions to "personal use." Section 30114(b)(2) provides that contributions are "converted to personal use if . . . used to fulfill any commitment, obligation, or expense of a person *that would exist irrespective of* the candidate's election campaign or individual's duties as a holder of Federal office." 52 U.S.C. § 30114(b)(2) (emphasis added). Whether Senator Craig's legal expenses to withdraw his plea were expenses that would exist "irrespective" of his election campaign or official duties is the central question in this case.

B

The "irrespective definition" of personal use first made its appearance in a 1995 regulation that the FEC promulgated pursuant to notice and comment under FECA. At the time, FECA barred "personal use" of campaign contributions but did

not define the term. *See* 2 U.S.C. § 439a (1994).[1] Nor was the term defined in the FEC's pre-1995 regulations.

The 1995 regulation adopted the following definition:

> Personal use means any use of funds in a campaign account of a present or former candidate to fulfill a commitment, obligation or expense of any person *that would exist irrespective of* the candidate's campaign or duties as a Federal officeholder.

11 C.F.R. § 113.1(g) (emphasis added). The regulation went on, in subsection (g)(1)(i), to provide that "personal use includes but is not limited to the use of funds in a campaign account for" such items as clothing, tuition payments, and mortgage payments. *Id.* § 113.1(g)(1)(i). Finally, in subsection (g)(1)(ii), the regulation stated:

> The Commission will determine, on a case by case basis, whether other uses of funds in a campaign account fulfill a commitment, obligation or expense that would exist irrespective of the candidate's campaign or duties as a Federal officeholder, and therefore are personal use. Examples of such other uses include: (A) *Legal expenses*; (B) Meal expenses; (C) Travel expenses . . . ; and (D) Vehicle expenses . . . .

*Id.* § 113.1(g)(1)(ii) (emphasis added).

---

[1] FECA was moved from Title 2 of the U.S. Code to Title 52 in September 2014.

Together with the 1995 regulation, the FEC published an Explanation and Justification that described the "irrespective definition" as follows:

> If campaign funds are used for a financial obligation that is caused by campaign activity or the activities of an officeholder, that use is not personal use. However, if the obligation would exist even in the absence of the candidacy or even if the officeholder were not in office, then the use of funds for that obligation generally would be personal use.

*Expenditures; Reports by Political Committees; Personal Use of Campaign Funds*, 60 Fed. Reg. 7862, 7863-64 (Feb. 9, 1995). The FEC explained that the specific expenses listed in subsection (g)(1)(i) "would exist irrespective of the candidate's campaign or duties as a Federal officeholder. Therefore, the Commission regards them as inherently personal and subject to the personal use ban." *Id.* at 7864. The rule, it said, "treats the use of campaign funds for these expenses as *per se* personal use." *Id.* The Commission recognized, however, that "some expenses that do raise personal use issues cannot be characterized as either personal or campaign related in the majority of situations, so they cannot be addressed in a *per se* list." *Id.* at 7867. Those kinds of expenses were covered by subsection (g)(1)(ii). Under that subsection, the FEC said, it would apply the irrespective definition on a case-by-case basis. *Id.*

The FEC listed legal expenses under subsection (g)(1)(ii) as one of the items that required consideration on a case-by-case basis. The Commission could not include them in the per se personal use category, it explained, because it could foresee several kinds of legal expenses that would not exist in the absence of a campaign or an officeholder's duties: for example,

expenses that arise from complying with election laws, employing campaign staff, or contracting with campaign vendors. *Id.* at 7868. The Commission made clear, however, that "legal expenses will not be treated as though they are campaign or officeholder related merely because the underlying legal proceedings have some impact on the campaign or the officeholder's status. Thus, legal expenses associated with a divorce or charges of driving under the influence of alcohol will be treated as personal, rather than campaign or officeholder related." *Id.*

Thereafter, between 1995 and 2002, the FEC addressed the issue of legal expenses in its advisory opinions.[2] Those opinions developed what might be described as an "allegations standard" for determining whether legal expenses are personal. The FEC concluded that legal expenses incurred in litigation involving allegations "arising directly from campaign activity" are not personal, and campaign funds could be used to pay them. FEC Advisory Opinion 1995-23 (Shays), 1995 WL 437686, at *1 (July 20, 1995) (regarding expenses to defend a civil suit charging that Representative Shays had unlawfully taken down his opponent's campaign signs). By contrast, the use of campaign contributions for legal expenses "incurred to . . . present a legal defense to[] possible liabilities or violations of law that are unrelated to [a] campaign or officeholder status"

_____

[2] Under 52 U.S.C. § 30108, any person, candidate, or campaign committee may submit a written request for an FEC opinion regarding the application of FECA or an FEC rule or regulation to a "specific transaction or activity." *Id.* § 30108(a)(1). An advisory opinion provides a safe harbor for "any person involved in the specific transaction or activity with respect to which such advisory opinion is rendered," as well as for "any person involved in any specific transaction or activity which is indistinguishable in all its material aspects" from that addressed in the opinion. *Id.* § 30108(c).

would constitute the conversion of contributions for personal use. FEC Advisory Opinion 1996-24 (Cooley), 1996 WL 419823, at \*3-4 (June 27, 1996) (regarding legal expenses for responding to a possible Department of Veterans Affairs finding that Representative Cooley's wife had improperly received Veterans benefits).

In 2002, Congress expressly adopted the FEC's irrespective definition of personal use and added it to FECA. *See* Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, § 301, 116 Stat. 81, 95 (codified at 2 U.S.C. § 439a and recodified at 52 U.S.C. § 30114). It also codified certain of the per se personal use items that the FEC had listed in 11 C.F.R. § 113.1(g)(1)(i) and added others of its own. *See* 52 U.S.C. § 30114(b)(2).[3] It did not, however, codify or otherwise mention the language of 11 C.F.R. § 113.1(g)(1)(ii) relating to case-by-case consideration of other disbursements, such as legal expenses. That regulatory provision, as set out above, has not changed since 1995.[4]

---

[3] Under 52 U.S.C. § 30114(b)(2), campaign funds are "converted to personal use if . . . used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office, including -- (A) a home mortgage, rent, or utility payment; (B) a clothing purchase; (C) a noncampaign-related automobile expense; (D) a country club membership; (E) a vacation or other noncampaign-related trip; (F) a household food item; (G) a tuition payment; (H) admission to a sporting event, concert, theater, or other form of entertainment not associated with an election campaign; and (I) dues, fees, and other payments to a health club or recreational facility."

[4] Appellants note that, in a colloquy on the Senate floor between Senators Lieberman and Feingold, Senator Feingold stated that, "while the provision is intended to codify the FEC's current regulations on

In advisory opinions issued since 2002, the FEC has continued to apply the allegations standard for legal expenses that it established in its earlier opinions. In its 2003 Treffinger Advisory Opinion, for example, the FEC confirmed that in implementing the irrespective definition, it had "previously concluded that legal expenses in defense of allegations relating directly to the candidate's campaign activities or status as a Federal officeholder may be paid for with campaign funds," but that "[t]he use of campaign funds to pay for [a candidate's] defense against allegations that are not directly related to his campaign activity would be a conversion to personal use." FEC Advisory Opinion 2003-17 (Treffinger), 2003 WL 21894954, at *3 (July 25, 2003). Applying this standard, the FEC concluded that James Treffinger could use campaign funds to defend against counts of a criminal indictment "comprised of allegations of false [financial] reports made to the Commission" during his campaign for the U.S. Senate, but that he could not use them to defend against counts charging him with having defrauded a New Jersey county when he served as county executive. *Id.* at *4-5.

Similarly, in its Cunningham Advisory Opinion, the Commission found that Representative Cunningham could use campaign funds to pay legal expenses "associated with a grand jury investigation involving allegations . . . that [he] obtained

the use of campaign funds for personal expenses, we do not intend to codify any advisory opinion or other current interpretation of those regulations." 148 Cong. Rec. S2143 (Mar. 20, 2002). Whatever the weight of such a statement, our opinion does not rely on an assumption that Congress codified pre-2002 advisory opinions or interpretations. As discussed below, in this case we need only defer to those opinions to the extent of "their power to persuade," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). We defer to post-2002 advisory opinions on the same basis.

benefits . . . from [a defense contractor] because of his status as a U.S. Representative." FEC Advisory Opinion 2005-11 (Cunningham), 2005 WL 2470825, at *3 (Sept. 26, 2005). It cautioned, however, that "the use of campaign funds to pay for . . . representation in legal proceedings regarding any allegations that are not related to his campaign activity or duties as a Federal officeholder would constitute an impermissible personal use." *Id.*

There is no doubt, then, that the allegations standard is the standard the FEC has long and repeatedly applied to discern prohibited personal use of campaign funds to pay legal expenses.[5]

---

[5] *See, e.g.*, FEC Advisory Opinion 2009-20 (Visclosky), 2009 WL 2850351, at *1 (Aug. 28, 2009) (concluding that "the Committee may use campaign funds to pay legal fees and expenses incurred by Representative Visclosky's current and former congressional staff in connection with the Federal investigation of Representative Visclosky[] and other legal proceedings . . . because the allegations relate to Representative Visclosky's campaign and duties as a Federal officeholder," but that "[t]he use of campaign funds to pay for any such employee's representation in legal proceedings regarding allegations that are not related to Representative Visclosky's campaign activity or duties as a Federal officeholder . . . would constitute an impermissible personal use"); FEC Advisory Opinion 2006-35 (Kolbe), 2007 WL 419188, at *2-3 (Jan. 26, 2007) (explaining that legal expenses "incurred in legal proceedings involving allegations concerning the candidate's campaign activities or duties as a Federal officeholder" were permissible but that contributions could not be used for legal expenses incurred in connection with "other allegations . . . that do not concern the candidate's campaign activities or duties as a Federal officeholder"); *see also* FEC Advisory Opinion 2011-07 (Fleischmann), 2011 WL 2163318, at *2-3 (May 26, 2011); FEC Advisory Opinion 2009-12 (Coleman), 2009 WL 1904617, at *4-6 (June 26, 2009); FEC Advisory Opinion 2009-10 (Visclosky), 2009 WL 1811018, at *3 (June 18, 2009).

C

In the case now before us, the FEC's rationale for concluding that Senator Craig's legal expenditures constituted "personal use" was set out in the analysis that accompanied the Commission's "reason to believe" finding. Quoting the 1995 Explanation and Justification, the analysis noted that "[l]egal fees and expenses . . . 'will not be treated as though they are campaign or officeholder related merely because the underlying proceedings have some impact on the campaign or officeholder's status.'" Reason to Believe Finding at 7 (J.A. 69) (quoting 60 Fed. Reg. at 7868). For example, "'legal expenses associated with a divorce or charge of driving while under the influence of alcohol will be treated as personal, rather than campaign or officeholder related.'" *Id.* (quoting 60 Fed. Reg. at 7868). The underlying standard, the FEC said, is reflected in "a long line of Advisory Opinions" in which "the Commission has determined that legal fees and expenses incurred for representation in legal proceedings regarding any allegations that are not related to campaign activities or duties as a Federal officeholder would constitute an impermissible personal use of campaign funds." *Id.* at 9-10 (J.A. 71-72) (citing FEC Advisory Opinion 2005-11 (Cunningham), 2005 WL 2470825 (Sept. 26, 2005); FEC Advisory Opinion 1996-24 (Cooley), 1996 WL 419823 (June 27, 1996); FEC Advisory Opinion 2003-17 (Treffinger), 2003 WL 21894954 (July 25, 2003)).

The FEC found that application of the allegations standard to Senator Craig's expenditures was straightforward. "The campaign funds disbursed by Craig to [his attorneys] to overturn the conviction" on the charge of disorderly conduct, the FEC said, were "similar to 'legal expenses associated with a divorce or charge of driving while under the influence of alcohol.'" *Id.* at 11 (J.A. 73) (quoting 60 Fed. Reg. at 7868). Those, the FEC said, were expenses that "would exist irrespective of the status

of the individual as a candidate or officeholder, and so would not be a permissible use of campaign funds . . . even if the arrest and conviction impacted his status as a Federal officeholder." *Id.* Accordingly, the FEC concluded, the use of campaign funds to pay such expenses constituted a conversion to personal use in violation of § 30114(b).

D

It is always appropriate to accord an agency's interpretation of its organic statute at least a measure of deference proportional to the "'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 268-69 (2006). Those considerations apply here. Proceeding in this "old-fashioned way," *Miller v. Clinton*, 687 F.3d 1332, 1342 & n.11 (D.C. Cir. 2012), we are persuaded that the FEC's is the better reading of the statute.[6]

First, the FEC's focus on the allegations of the legal proceedings fits well with the irrespective definition embodied in the statutory language. Examining the allegations is a natural way to determine whether expenditures in response to such

---

[6] This circuit has held that FEC advisory opinions, like those cited in the *Craig* "reason to believe" analysis, qualify for the level of deference required by *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 (1984). *See FEC v. Nat'l Rifle Ass'n. of Am.*, 254 F.3d 173, 185-86 (D.C. Cir. 2001). The appellants do not dispute the point. *See* Craig Br. 29-30. Under *Chevron*, we would defer to an agency's reasonable interpretation of ambiguous statutory language. But we do not need to accord that level of deference to resolve this case.

allegations "would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office." 52 U.S.C. § 30114(b)(2). Allegations that *are* "related to campaign activities or duties as a Federal officeholder" necessarily would not exist if there were no campaign or if the individual had no official duties. Allegations that *are not* related, by contrast, generally would exist irrespective of a campaign or official duties. We use the word "generally" in the previous sentence because there is a possible exception for unrelated allegations that a complainant levels against a candidate or officeholder because of the target's campaign or official duties. We address that "alleger's motive exception" in Part III.A.3 below.

Second, the allegations standard evidences the kind of thoroughness of consideration and consistency of application that warrants deference. As the history recounted in Part II.B reflects, the FEC is correct in saying that the allegations standard is reflected in "a long line of Advisory Opinions" that declare that spending campaign funds on "legal fees and expenses incurred for representation in legal proceedings regarding any allegations that are not related to campaign activities or duties as a Federal officeholder would constitute an impermissible personal use of campaign funds." Reason to Believe Finding at 9 (J.A. 71).

Finally, we agree with the FEC that applying the allegations standard to Senator Craig's case is straightforward. The allegations that gave rise to his guilty plea were the misdemeanor charges for disorderly conduct and interference with privacy that the State of Minnesota filed against him. Because those allegations did not concern the Senator's campaign activities or official duties, the legal fees he expended trying to withdraw his plea constituted "personal use." To put the analysis squarely in the terms of the statute: the appellants'

expenditures to withdraw Senator Craig's guilty plea would have existed irrespective of his reelection campaign or Senatorial duties because the charges that prompted those expenditures did not relate to that campaign or those duties. Accordingly, the appellants violated 52 U.S.C. § 30114(b) when they used campaign committee funds to pay for the legal fees incurred in pursuing withdrawal of the plea.

III

Needless to say, the appellants disagree that the legal expenditures at issue here constituted personal use of campaign funds. They do not dispute that the criminal allegations to which Senator Craig pled guilty related only to his personal conduct.[7] But they reject application of an allegations standard to determine whether the legal expenses the Senator incurred would have existed irrespective of his campaign activities or official duties. A proper application of the irrespective definition, they maintain, would give greater attention to "the circumstances giving rise to the expenditures." Craig Br. 28. Had Craig "not been a sitting U.S. Senator at the time," they argue, "the Minnesota incident and plea would not have been a national media event." *Id.* "Nor would the publication of such a plea have normally engendered immediate professional repercussions -- including congressional investigations and loss of professional stature and authority -- for a private individual." *Id.* Those "events reasonably relate to a campaign or official

---

[7] *See* Oral Arg. Recording 18:50-57 (acknowledgment by Senator Craig's counsel that the conduct that led to the Senator's arrest "was purely personal"); Letter from Brand Law Group to Hon. Barbara Boxer (Sept. 5, 2007) (J.A. 179) (statement by Senator Craig's attorneys that his arrest was for "purely personal conduct unrelated to the performance of official Senate duties").

duties," they conclude, and hence "cement[] the connection between the expenditures and his federal office." *Id.* at 29.

In order to take those circumstances into account, the appellants urge us to apply one of three alternative standards, any one of which they believe does a better job of giving content to the statutory irrespective definition than does the allegations standard. We reject their urging, concluding that the FEC's allegations standard offers the better interpretation of the statutory definition of personal use in the context of legal expenses.

A

In their briefs, the appellants' principal contention is that the FEC itself does not customarily apply an allegations standard, but rather "applies a 'reasonableness' standard to evaluate whether expenses were incurred 'irrespective' of campaign or official obligations." Craig Br. 6. "A principled personal use analysis," they maintain, "must examine whether the relevant events *reasonably relate* to a campaign or official duties." *Id.* at 29 (emphasis added). In their view, "Senator Craig's legal expenses are reasonably related to his position because, absent the publication of his plea and the resulting media coverage, Senator Craig would never have filed an appeal of that plea." *Id.* at 21.

1. In support of their claim that the FEC has historically applied such a "reasonableness standard," the appellants take three steps. First, they point to the following statement from the 1995 Explanation and Justification: "[C]andidates have wide discretion over the use of campaign funds. If the candidate can *reasonably* show that the expenses at issue resulted from campaign or officeholder activities, the Commission will not consider the use to be personal use." Craig Br. 6 (quoting 60

Fed. Reg. at 7867 (emphasis added by appellants)); *see id.* at 26.
Second, substituting their own words for portions of this
statement, the appellants say it means that, "'[i]f the candidate
can reasonably show that expenses at issue' *pertain to*
officeholder duties, 'the Commission will not consider them to
be personal use.'" *Id.* at 26 (quoting 60 Fed. Reg. at 7867)
(principal insertion italicized).    Finally, with a further
substitution, appellants maintain that all that is required is that
"Senator Craig's legal expenses were reasonably *related to* his
duties."  *Id.* at 27 (internal quotation marks omitted) (insertion
italicized).

In response, the FEC protests that it does not apply a
reasonableness standard in deciding whether the expenditure of
campaign contributions was for personal use.    Rather, the
statement the appellants quote from the Explanation and
Justification merely reflects the evidentiary burden -- a
reasonable showing -- required to establish that the use was not
personal.  That burden, however, does not alter the underlying
statutory definition of personal use.  The appellants "ha[ve]
simply . . . conflat[ed] an officeholder's evidentiary burden with
the actual legal standard."  FEC Br. 24.

Careful attention to the three steps of the appellants'
argument makes clear that the FEC is correct.  The first step, the
text of the Explanation and Justification itself, supports the
FEC's position that "reasonably show" merely describes a
standard of proof:  the candidate must "reasonably show that the
expenses at issue resulted from campaign or officeholder
activities."  60 Fed. Reg. at 7867.  At the same time, the text's
"resulted from" language reflects the causal nature of the
irrespective definition.[8]  The appellants' second step, however,

_____

[8] *See also* 60 Fed. Reg. at 7863-64 ("If campaign funds are used
for a financial obligation that is *caused by* campaign activity or the

substitutes "pertain[s] to" for the FEC's "resulted from," thus eliminating the causal requirement. Finally, the appellants' last step completes the transformation, changing "reasonably *show*" to "reasonably *related to*," thus converting a standard of proof of causation into a non-causal relationship standard.[9] In short, the appellants' proffered standard is inconsistent with both the 1995 Explanation and Justification and the statutory text, both of which contemplate a causal relationship between expenses and campaigns or official duties.

2. The appellants also maintain that there is support for their proposed reasonableness standard in § 113.1(g)(1)(ii) of the FEC's personal use regulation. As discussed above, that provision states that "[t]he Commission will determine, on a case-by-case basis," whether expenses that are not on the per se personal list -- including legal (and, e.g., travel) expenses -- "would exist irrespective of the candidate's campaign or duties as a Federal officeholder, and therefore are personal use." 11 C.F.R. § 113.1(g)(1)(ii); *see id.* § 113.1(g)(1)(ii)(A), (C). The appellants insist this must mean that the FEC will decide the nature of each legal expense through "a case-by-case analysis of [the] candidate's or official's rationale," Reply Br. 1, and that the FEC erred by "categorically" treating "*all* legal expenditures stemming from personal conduct" as expenditures for personal use, Craig Br. 25.

_____

activities of an officeholder, that use is not personal use." (emphasis added)).

[9] While the allegations standard discussed in Part II.B above does invoke the term "relate[d] to," it does so in a different relational context. The allegations standard allows use of campaign funds for expenses *resulting from* allegations *related to* a campaign or officeholder duties -- thus maintaining the causal relationship in the statutory definition that appellants' proposed alternative would discard.

But that is not what "case-by-case" must mean. Nothing in that adjectival phrase precludes the Commission from delineating personal and nonpersonal categories of legal expenses in the common law tradition -- as individual cases come to its attention in the form of complaints or requests for advisory opinions. In this sense, case-by-case merely means that the FEC does not regard all categories of legal (or travel) expenses as per se personal -- as it does all categories of home mortgage and clothing expenditures -- but rather that it will decide which categories are personal when presented with actual cases.

And that is precisely how the Commission has treated the issue in its advisory opinions. For example, in 1995 the FEC advised that family travel to participate in campaign activities is not personal; family vacation travel, however, is. *See* FEC Advisory Opinion 1995-20 (Roemer), 1995 WL 437687, at *2 (June 30, 1995).[10] Similarly, twenty years of advisory opinions have concluded that legal expenditures made in response to charges of campaign or official misconduct are not personal; expenditures to rebut allegations of personal misconduct are. *See supra* Part II.B (describing and citing those advisory opinions).

3. The appellants further maintain that their "reasonableness" (more accurately, their "reasonably related") standard is reflected in three kinds of FEC advisory opinions, all of which have "acknowledged that members of Congress are subject to heightened public and media scrutiny." Craig Br. 7.

---

[10] When Congress amended FECA in 2002 to include a definition of personal use, it codified this categorization. *See* 52 U.S.C. § 30114(b)(2)(E) (including, in the list of per se personal uses, the use of campaign contributions for "a vacation or other noncampaign-related trip").

"Senator Craig's use of campaign funds for legal expenses," they say, "is analogous to the expenditures sanctioned by the FEC in" those cases. *Id.* at 29. We disagree.

We begin with the Miller Advisory Opinion. *See* FEC Advisory Opinion 2013-11 (Miller), 2013 WL 6022101 (Oct. 31, 2013). There, the FEC approved a Senate candidate's expenditure of campaign funds to oppose a state court lawsuit brought by media outlets seeking access to personnel records from the candidate's previous job as a municipal employee. Although the opinion did not mention any allegations regarding campaign activities, it did note that the plaintiffs "asserted in their civil complaints that the disclosure of these records was necessary for the Alaska electorate to be able to fully, fairly, and timely consider matters relevant to Mr. Miller's candidacy" for the U.S. Senate. *Id.* at \*3 (internal quotation marks omitted). That made clear, the FEC said, that the lawsuit "was directly and explicitly related to Miller's candidacy and would not have existed irrespective of his campaign." *Id.* This wording may suggest that the FEC contemplates an "alleger's motive exception" to the allegations standard for litigation expenses, although the Miller Advisory Opinion appears to be the only one to suggest such a possibility.[11]

_____

[11] The appellants contend that the Vitter Advisory Opinion is a second opinion of the same kind. *See* FEC Advisory Opinion 2008-07 (Vitter), 2008 WL 4265321, at \*3 (Sept. 9, 2008). But the relevant section of that opinion says nothing more than that "[t]he Commission could not approve a response by the required four affirmative votes with regard to" Senator Vitter's request to use campaign funds to pay for legal expenses incurred in an effort to quash subpoenas for information related to the Senator's alleged personal conduct. *Id.* at \*2, \*4. The appellants nonetheless maintain that a draft opinion by FEC staff shows that some commissioners would have allowed Senator Vitter to use campaign contributions for such legal expenses because the issuer of the subpoena had singled him out due to his

We need not pass on the validity of such an exception today. The appellants do not contend that Minnesota brought the disorderly conduct charge against Senator Craig because of his official position. *See* Oral Arg. Recording 10:05-13 (agreeing that the Senator was not "targeted" for arrest). To the contrary, the arresting officer did not even know that Craig was a Senator until after the arrest, when Craig showed the officer his business card and asked, "[w]hat do you think of that?" Police Narrative (June 11, 2007) (J.A. 204).

The appellants also proffer, as analogous, FEC advisory opinions that authorize the use of campaign contributions to respond to media inquiries. The FEC has permitted such expenditures even when the inquiries do not relate to campaigns or officeholder duties.[12] In the Kerrey Advisory Opinion, for example, the FEC authorized the use of campaign funds to respond to media inquiries regarding former Senator Robert Kerrey's activities during the Vietnam War *because* those inquiries "would not have occurred if Mr. Kerrey had not been a prominent Senator and prominent Federal candidate" for President. FEC Advisory Opinion 2001-09 (Kerrey), 2001 WL 844352, at *4 (July 17, 2001). Similarly, the Hilliard Advisory Opinion explained:

---

status as a Senator. Craig Br. 10 (citing Draft FEC Advisory Opinion 2008-07 (Vitter), Doc. No. 08-20-A (Aug. 20, 2008)). But there is no evidence that any of the commissioners adopted the reasoning reflected in the draft, and the final opinion makes clear that the FEC could not reach a conclusion on the matter.

[12] *See, e.g.*, FEC Advisory Opinion 2008-07 (Vitter), 2008 WL 4265321, at *4 & n.2 (Sept. 9, 2008); FEC Advisory Opinion 2001-09 (Kerrey), 2001 WL 844352, at *3-4 (July 17, 2001); FEC Advisory Opinion 1998-1 (Hilliard), 1998 WL 108618, at *4 (Feb. 27, 1998).

> The Commission [has] recognized . . . that the activities of candidates and officeholders may receive heightened scrutiny and attention in the news media *because* of their status as candidates and officeholders. It [has] stated that the obvious need for a candidate to respond to allegations that result from this elevated scrutiny would not exist irrespective of the candidate's campaign or officeholder status.

FEC Advisory Opinion 1998-1 (Hilliard), 1998 WL 108618, at *4 (Feb. 27, 1998) (emphasis added) (citations omitted).

The media advisory opinions may suggest a kind of "inquirer's motive exception" for responding to press inquiries -- analogous to the "alleger's motive exception" suggested by the Miller Advisory Opinion. But again, we need not pass on the validity of such an exception because the FEC did not charge the appellants with violating FECA by using campaign funds to respond to press inquiries regarding Senator Craig's guilty plea. *See* FEC Compl. ¶¶ 26, 33 (J.A. 59-60). Thus, whatever room there may be for applying an inquirer's motive exception in some cases, the application of such an exception is not relevant here.

Finally, the appellants argue that their proposed reasonableness standard is consistent with FEC advisory opinions that authorize the use of campaign contributions to pay legal expenses incurred in connection with Senate Ethics Committee investigations. As with media inquiries, the FEC has authorized the use of campaign contributions in such circumstances, even for investigations involving Senators' purely personal conduct.[13] But the FEC did not need *any* kind

---

[13] *See, e.g.*, FEC Advisory Opinion 2008-07 (Vitter), 2008 WL 4265321, at *3 (Sept. 9, 2008); FEC Advisory Opinion 2006-35

of interpretive standard to help it apply FECA's irrespective definition to those situations. Because the Senate Ethics Committee has jurisdiction only over individuals who are Senators (or congressional officers or employees), a Senator's legal expenses in such an investigation could not have existed irrespective of his official duties -- regardless of whether the conduct at issue was personal or official. Consistent with this understanding, the FEC did not object to the appellants' expenditures for responding to the Ethics Committee inquiry in this case. *See* FEC Compl. ¶ 26 (J.A. 59).

B

The appellants' opening brief hints, if cryptically, at a second alternative standard that they believe justifies the use of campaign funds to pay Senator Craig's legal expenses: "the impetus for expending committee funds." Craig Br. 25. Their reply brief expands on this alternative, contending that some advisory opinions have "assessed an individual's motivation for . . . committee expenditures" and permitted them if the individual's -- that is, the candidate's or officeholder's -- motives related to his campaign or duties. Reply Br. 12.

This alternative might be described as yet another motive exception to the allegations standard. But unlike the possible motive exceptions discussed in Part III.A, this exception would not look to the motive of the person who made the allegations or press inquiries, but rather to the motive of the candidate or officeholder who spent the campaign funds to respond to those allegations or inquiries. As applied to the facts of this case, the appellants' argument is that Craig's "decis[ion] to challenge

(Kolbe), 2007 WL 419188, at *2 (Jan. 26, 2007); FEC Advisory Opinion 1998-1 (Hilliard), 1998 WL 108618, at *5 (Feb. 27, 1998).

[his] plea" was part of "an effort to remain in office and make his reelection viable." Reply Br. 16. In that sense, they suggest, the legal expenses would not have existed irrespective of his office.

There is no support for such an "officeholder's motive standard" in any of the advisory opinions that the appellants cite. Those opinions are the same ones that we discussed in Part III.A, and that, as we have already explained, at most provide some support for taking into account the motive of the officeholder's *accuser or inquirer*. None of them focus on the *officeholder's* motive for spending money to answer those accusations or inquiries.

More important, a standard that looks to the officeholder's motive is inconsistent with the statutory scheme. As we have noted, 52 U.S.C. § 30114(b)(2) contains a specific list of expenses that Congress regarded as existing irrespective of a candidate's campaign or an officeholder's duties, including home mortgage payments, clothing purchases, and tuition payments. *Id.* § 30114(b)(2)(A), (B), (G); *see supra* note 3. Yet, if an officeholder's motive to "make his reelection viable," Reply Br. 16, were relevant to the statutory analysis, it is hard to see why Congress would have placed those kinds of expenditures off limits. Surely there are members of Congress who regard owning homes in their districts, improving the quality of their clothing, or obtaining advanced degrees as necessary to increase their electoral chances. Because Congress' examples leave no room for consideration of a candidate's motive, neither does the general ban. *Cf. Samantar v. Yousuf*, 130 S. Ct. 2278, 2287-88 (2010); *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004).

An officeholder's motive standard is also inconsistent with the FEC's 1995 Explanation and Justification, which listed two

paradigmatic examples of legal expenses that "will be treated as personal, rather than campaign or officeholder related": "legal expenses associated with a divorce or charges of driving under the influence of alcohol." 60 Fed. Reg. at 7868. Subsequent advisory opinions have repeatedly cited those examples.[14] Yet surely a Senator could regard a defense against messy divorce or DUI allegations as no less necessary to "an effort to remain in office and make his reelection viable" than Senator Craig's attempt to withdraw his guilty plea. Indeed, it is hard to imagine any kind of criminal (or even controversial civil) matter for which such a claim could not be made. In short, grafting an officeholder's motive standard onto the statutory definition of personal use would swallow the definition whole, rendering nonpersonal virtually any use of campaign funds for legal expenses. And that plainly could not have been Congress' intent in drafting § 30114(b)(2).[15]

---

[14] *See, e.g.*, FEC Advisory Opinion 2013-11 (Miller), 2013 WL 6022101, at *3 (Oct. 31, 2013); FEC Advisory Opinion 2011-07 (Fleischmann), 2011 WL 2163318, at *2 (May 26, 2011); FEC Advisory Opinion 2009-12 (Coleman), 2009 WL 1904617, at *4 (June 26, 2009); FEC Advisory Opinion 2008-07 (Vitter), 2008 WL 4265321, at *3 (Sept. 9, 2008).

[15] The appellants repeatedly emphasize that Senator Craig did not appeal his plea until after it was publicized. But their suggestion that this makes his expenditures different from those he might have made had he challenged the plea before the charges became public is unpersuasive. Given the level of media scrutiny of public officials, any legal allegation of personal wrongdoing will rarely remain secret for long, rendering the line the appellants have attempted to draw ephemeral. In any event, the appellants' rationale for drawing a line at the publication of the Senator's plea ultimately rests on the Senator's *motive* for seeking its withdrawal: his "hop[e] that he could seek election in Idaho for an additional six-year term in the United States Senate." Reply Br. 16 (internal quotation marks omitted). For

C

Finally, the appellants' reply brief hints at yet a third standard: "an elected official's status [may] prompt[] *increased* legal costs for what would normally be a personal matter," which could "justif[y] paying for those increased costs with campaign committee funds." Reply Br. 18 (emphasis added). At oral argument, this hint became the appellants' principal proposed standard, which they christened the "delta standard": an officeholder or candidate, they argued, should be able to use campaign funds to pay the difference (the delta) between the amount the candidate or officeholder actually spent on legal expenses and the amount a reasonable person without that status would have spent. In the appellants' view, because "no reasonable person" would have spent nearly $200,000 to attack a misdemeanor plea, those expenditures by the Craig Committee did not constitute personal use. *See* Oral Arg. Recording 7:00-12, 13:06-17.

As our precedents make clear, a party cannot preserve an appellate issue by hinting at it in a reply brief and pressing it at oral argument.[16] Accordingly, the appellants have forfeited their challenge to the district court's judgment on the basis of their proposed delta standard.

---

the reasons stated above, we conclude that such an officeholder's motive standard is unwarranted.

[16] *See, e.g.*, *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003); *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990); *see also Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 n.2 (2014) ("We will not revive a forfeited argument simply because the petitioner gestures toward it in its reply brief.").

Even if it were not forfeited, however, the proposed delta standard would be unwarranted. There is no support for it in any FEC advisory opinion.[17] Nor is it workable. We struggle to imagine how the Commission or a court could calculate the "delta" between what a particular member of Congress spent on a given legal expense and what a "reasonable" non-member would have found sufficient.[18]

More important, like the officeholder's motive standard discussed in Part III.B (of which the delta standard is really only a marginal cost variant), the delta standard is inconsistent with the statutory scheme. If Congress had intended the application of a delta standard, it is hard to see why it would have wholly barred the use of campaign funds for expenses like home mortgages and clothing purchases. 52 U.S.C. § 30114(b)(2)(A), (B). Surely some members of Congress buy two homes as a consequence of their position -- one in Washington and one in their district -- when a reasonable member of the general public

---

[17] The appellants claim to derive the delta standard from a draft advisory opinion in the Vitter matter. As we have noted, there is no evidence that any individual commissioner embraced that draft's reasoning, and the Commission itself did not adopt the draft. *See supra* note 11. Because the draft opinion does not represent the views of the Commission, the appellants acknowledge that it does not warrant any deference from this court. Oral Arg. Recording 16:22-31.

[18] We asked at oral argument, for example, how a court could determine what a "reasonable" non-member would spend to resist a divorce he or she did not want. The appellants' only response was that the FEC would have to conduct a "case-by-case" analysis. Oral Arg. Recording 17:50-56.

would not. And surely some members spend more on their clothing than would an ordinary citizen.[19]

Similarly, a delta standard is inconsistent with the two paradigmatic examples of personal legal expenses for which no campaign funds may be spent: "legal expenses associated with a divorce or charges of driving under the influence of alcohol." 60 Fed. Reg. at 7868. Once again, surely there are officeholders who would spend more than an ordinary person to defend such cases, which might well destroy a political career but not one in the private sector. And because there is no principled way to distinguish divorce or DUI cases from most other litigation (including misdemeanor disorderly conduct cases), a delta standard would not only swallow those examples but would authorize the payment of at least partial expenses in virtually any litigation involving personal conduct.

In sum, even were it not forfeited, we would reject the appellants' proposed delta standard as both unworkable and inconsistent with the statutory and regulatory schemes.

D

For the foregoing reasons, we conclude that the FEC's allegations standard -- and not the appellants' proposed "reasonableness," "officeholder's motive," or "delta" standard -- offers the better interpretation of the statutory definition of personal use. And because the criminal allegations

---

[19] We also note that the appellants' focus on whether the "elected official's *status* has increased the costs relating to a personal matter," Reply Br. 18 (emphasis added), appears inconsistent with the statute, which focuses on the "individual's *duties* as a holder of Federal office," 52 U.S.C. § 30114(b)(2) (emphasis added). We acknowledge, however, that the FEC frequently uses the terms interchangeably.

against Senator Craig were not related to his campaign activity or official duties, we conclude that the appellants' use of campaign funds to pay the expenses of fighting those allegations violated 52 U.S.C. § 30114(b).[20]

IV

FECA grants district courts broad authority to fashion remedies for violations of the statute. "[U]pon a proper showing that the person involved has committed, or is about to commit . . . , a violation of [the] Act," FECA authorizes the court to "grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation." 52 U.S.C. § 30109(a)(6)(b). In this case, the district court ordered Senator Craig to disgorge to the U.S. Treasury the full amount of funds converted to personal use (amounting, by the court's calculation, to $197,535). It further ordered him to pay a $45,000 civil penalty.

The appellants challenge both the disgorgement and the civil penalty orders. We review both orders for abuse of discretion. *See SEC v. Whittemore*, 659 F.3d 1, 9 (D.C. Cir. 2011); *AFL-CIO v. FEC*, 628 F.2d 97, 100 (D.C. Cir. 1980). We will find that the district court abused its discretion only "if it did not apply the correct legal standard . . . or if it misapprehended the underlying substantive law." *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1496 (D.C. Cir. 1995).

---

[20] In the district court, the appellants argued that Senator Craig's legal expenses were related to his officeholder duties because he was on official travel back to Washington at the time of his arrest. The district court rejected that argument, *Craig for U.S. Senate*, 933 F. Supp. 2d at 118, and the appellants do not renew it on appeal.

We address the disgorgement order in Part IV.A and the civil penalty order in Part IV.B.

A

The district court determined that a "disgorgement order [wa]s necessary to avoid the unjust enrichment of Senator Craig, and to 'deprive the wrongdoer of his ill-gotten gain.'" *Craig for U.S. Senate*, 70 F. Supp. 3d at 97 (quoting *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994)). It ordered the Senator to disgorge the funds he unlawfully converted to personal use and directed that he pay them to the Treasury, rather than to the Craig Committee, explaining that "the Craig Committee [wa]s essentially defunct" and had become "little more than an alter-ego for Senator Craig himself." *Id.* at 101.[21] Moreover, the court said, were the Craig Committee to receive the disgorged funds, then "sole[] responsib[ility] for the proper disposition of the funds" would be placed in the hands of the same person who had misused them in the first place, since by that time Senator Craig had appointed himself Treasurer (and sole staff member) of the Craig Committee. *Id.*

The appellants do not dispute the district court's authority to order the remedy of disgorgement. Oral Arg. Recording 19:24-35. Instead, they challenge the court's specific order on a number of grounds, all ultimately resting on the fact that the court ordered disgorgement to the Treasury rather than to the Craig Committee. *Id.* Their challenges are not persuasive.

---

[21] The court noted that "Senator Craig has no plans to run for office again[;] he is the Committee's only staff member[;] . . . [and] the Craig Committee has essentially no money." *Craig for U.S. Senate*, 70 F. Supp. 3d at 101.

First, the appellants insist that the court's order "does not actually effect disgorgement because it fails to return the funds to the committee." Craig Br. 33. "Disgorgement," they contend, "is an equitable remedy that aims to restore the status quo," and directing the money to the Treasury rather than returning it to the Committee does not achieve that aim. Craig Br. 21. But as this court has said before, "[t]he primary purpose of disgorgement is *not* to refund others for losses suffered but rather 'to deprive the wrongdoer of his ill-gotten gain.'" *Bilzerian*, 29 F.3d at 697 (emphasis added) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)). Following that principle, courts of appeals have often affirmed the propriety of directing disgorged funds to the U.S. Treasury. *See, e.g.*, *United States v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) ("Upon awarding disgorgement, a district court may exercise its discretion to direct the money toward victim compensation or to the United States Treasury.").[22] Moreover, FECA does not even speak of "disgorgement" orders, but rather of "other" orders, which would give the district court some leeway even if there were not substantial precedent for directing disgorgement to the Treasury.

Second, the appellants contend that the order "functions as a penalty rather than disgorgement." Craig Br. 32 (capitalization omitted). In directing payment to the Treasury, they argue, "the order seeks to punish Senator Craig for his conduct by preventing him from using these funds for a permissible purpose." *Id.* at 33; *see id.* at 32-33 (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (stating that "disgorgement may not be used punitively")). But

---

[22] *See also, e.g.*, *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006); *SEC v. Fischbach Corp.*, 133 F.3d 170, 175-76 (2d Cir. 1997); *FTC v. Febre*, 128 F.3d 530, 537 (7th Cir. 1997).

as we have just noted, it is not uncommon for remedial disgorgement orders to direct funds to the Treasury. Moreover, the district court's rationale made clear that its intention was not punitive: the court did not direct the funds to the Treasury to punish Senator Craig, but rather to ensure that they were not returned to the person who had misused them.

Third, the appellants argue that the FEC's customary practice, in the context of administrative conciliation agreements to resolve personal use violations, is to require disgorgement of funds to campaign committees. *See* Craig Br. 38-39. Although this accurately describes the conciliation agreements cited by the appellants, the FEC explains that those cases involved refunds to committees with treasurers who had not themselves spent campaign funds for their personal use, as well as committees that "could have spent refunded amounts on later campaigns." FEC Br. 38-39. And in any event, the resolution of matters under the FECA subsection that authorizes the Commission to "attempt . . . to correct or prevent such violation[s] by informal methods of conference, conciliation, and persuasion," 52 U.S.C. § 30109(a)(4)(A)(i), does not constrain a district court acting pursuant to § 30109(a)(6)(B).

Finally, the appellants assert that, by sending the disgorged funds to the Treasury, the district court violated the First Amendment rights of Senator Craig, the Craig Committee, and the Committee's donors. The only cases they cite in support are *Buckley v. Valeo*, 424 U.S. 1 (1976), and *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014), which stand for the propositions that campaign contributions can constitute protected speech and that restrictions on such contributions can violate the First Amendment under certain circumstances. But the disgorgement order is not a campaign finance restriction, and it does not limit donors' campaign contributions. The court's order does no more than enforce the obligation of a campaign committee to

follow laws that are unrelated to the restriction of free expression. A campaign committee that violates occupational safety or wage and hour laws can be required to pay for such wrongdoing, notwithstanding that the payment ultimately comes from campaign contributions. If the contributors' original intent has thereby been thwarted, they have the campaign committee -- not the court -- to blame.

We therefore conclude that the district court did not abuse its discretion in ordering Senator Craig to disgorge $197,535 to the U.S. Treasury.

B

The district court further determined "that a penalty over and above the disgorgement is also appropriate given the seriousness of the violation here." *Craig for U.S. Senate*, 70 F. Supp. 3d at 97. It ordered Senator Craig to pay a $45,000 civil penalty -- roughly $155,000 less than the statutory maximum (the amount of the unlawful expenditure) and $25,000 less than the amount requested by the FEC. Noting that "[t]he assessment of [a] civil penalt[y] is discretionary," the appellants maintain that the district court should not have assessed a penalty at all. Craig Br. 42 (internal quotation marks omitted). They offer four reasons. Again, none is persuasive.

First, the appellants maintain that "disgorging $197,535 would constitute a harsh penalty in itself." *Id.* As we have explained, however, the disgorgement order did not punish Senator Craig, but rather deprived him of his improper gains. Indeed, as the district court noted, imposing a lower civil penalty would "threaten[] to become something equivalent to interest on a loan payment for the immediate use of campaign funds." *Craig for U.S. Senate*, 70 F. Supp. 3d at 100 (quoting Hr'g Tr. at 16). And assessing no penalty at all would have been

equivalent to giving Senator Craig the benefit of an interest-free loan.

Second, the appellants note that Senator Craig suffered "severe professional and personal consequences" as a result of his arrest for disorderly conduct. Craig Br. 42. That is no doubt true, but those were not the consequences of any liability flowing from his FECA violation. The court did not abuse its discretion in concluding that a penalty for that violation was in order.

Third, the appellants argue that "the personal use standards developed by the FEC are ambiguous at best," and that it was "unreasonable to punish Senator Craig for failing to accurately discern the appropriate standards." *Id.* at 43. As we discussed in Part II, however, the FEC has applied the allegations standard to determine personal use for two decades, and there is no dispute that the criminal allegations leveled against the Senator had no relation to his campaign or official duties.[23] Moreover, if the appellants had any lingering doubts regarding the appropriate standard, the statute gave them the right to request an advisory opinion "with respect to [the] specific transaction[s]." 52 U.S.C. § 30108(a)(1); *see supra* note 2. Instead, as the district court noted, the appellants "decided to forego what would have been a significant demonstration of good faith and declined to request an advisory opinion from the FEC." *Craig for U.S. Senate*, 70 F. Supp. 3d at 99.

---

[23] *See Craig for U.S. Senate*, 70 F. Supp. 3d at 88-89 (finding that the defendants "disregard[ed] clear admonitory language in the advisory opinion on which they relied most heavily" (internal quotation marks omitted) (citing FEC Advisory Opinion 2006-35 (Kolbe), 2007 WL 419188 (Jan. 26, 2007))).

Finally, the appellants complain that "the defendant's state of mind is a key consideration" in evaluating whether a civil penalty is warranted, and that in this case Senator Craig "relied in good faith on the advice of counsel and would not have made the committee expenditure had he not received authorization from counsel." Craig Br. 43-44. But the district court did take the defendants' "reli[ance] on the advice of counsel" into consideration, *Craig for U.S. Senate*, 70 F. Supp. 3d at 99, notwithstanding an interrogatory answer that expressly waived such reliance, First Set of Interrogs. at No. 5 (J.A. 166).[24] The court's conclusion that such reliance did not outweigh the other factors that counseled imposition of a penalty, *Craig for U.S. Senate*, 70 F. Supp. 3d at 99, did not constitute an abuse of discretion.

V

For the foregoing reasons, we conclude that the district court did not err in finding that the appellants unlawfully converted campaign contributions to personal use by spending them on Senator Craig's effort to withdraw his guilty plea. Nor did the court abuse its discretion by ordering the Senator to disgorge $197,535 to the United States Treasury and pay a civil penalty of $45,000. Accordingly, the judgment and remedial orders of the district court are

*Affirmed.*

---

[24] *See* First Set of Interrogs. at No. 5 (J.A. 166) (stating, in response to a query as to whether reliance on advice of counsel "should be a factor in the Court's decision regarding remedies in this case," that the "Defendants do not claim reliance upon advice of counsel").